In re Dorothy I. STANLEY, Debtor.

Sara J. Daneman, Chapter
7 Trustee, Plaintiff,

v.

Robert G. Stanley and Sherry
L. Stanley, Defendants.

Robert G. Stanley, Cross–Claimant,

v.

Sherry L. Stanley, Cross–Defendant.

Bankruptcy No. 05–62865.
Adversary No. 07–2110.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division,
at Columbus.

March 28, 2008.

Sara J. Daneman, Gahanna, OH, pro se.

J. Matthew Fisher, Allen, Kuehnle & Stovall LLP, Kenneth M. Richards, Columbus, OH, for Defendants/Cross-Claimant/Cross Defendant.

***MEMORANDUM OPINION ON COMPLAINT TO AVOID TRANSFERS AND CROSS–CLAIM FOR INDEMNIFICATION AND CONTRIBUTION***

JOHN E. HOFFMAN, JR., Bankruptcy Judge.

### I. Introduction

Nearly two years prior to filing her Chapter 7 petition, Dorothy I. Stanley ("Debtor") transferred her real property to defendant Robert G. Stanley ("Robert"), one of her sons, for less than reasonably equivalent value. Almost a year later, Robert transferred the property to defendant Sherry L. Stanley ("Sherry"), his sister, in exchange for the amount he had invested in the property. Six months later, Sherry transferred the property to a non-family member for valuable consideration. The Chapter 7 trustee, Sara J. Daneman ("Trustee"), seeks to avoid the transfer of the property from the Debtor to Robert ("Transfer") as a fraudulent transfer and to recover money judgments from Robert and Sherry (collectively, "Defendants").

To prevail, the Trustee must prove that the Debtor made the Transfer either: (i) with actual intent to hinder, delay or defraud any of her creditors; or (ii) while in a financial condition that would lead to a finding of constructive fraud under state law. As explained below, the Court finds that the evidence does not support either a finding of actual fraud or constructive fraud. The Trustee, therefore, may not avoid the Transfer or obtain a money judgment against the Defendants.

This memorandum opinion constitutes the Court's findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52 (made applicable here by Fed. R. Bankr.P. 7052).

### II. Jurisdiction

The Court has jurisdiction to hear and determine this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. The Trustee's fraudulent transfer action is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(H). In light of the Court's ruling on the Trustee's cause of action, Robert's cross-claim against Sherry for indemnification and contribution is moot, and the Court need not decide whether it has jurisdiction to adjudicate the cross-claim.

### III. Background

In October 2003, the Debtor transferred real property located at 803 Rumsey Road, Columbus, Ohio ("Property") to Robert. On July 23, 2005 ("Petition Date"), the Debtor filed her Chapter 7 petition. On March 12, 2007, the Trustee commenced this adversary proceeding. On October 15, 2007, the Court conducted a trial during which it heard testimony from the

Debtor and the Defendants, and admitted exhibits offered by the Trustee, including the deeds by which the Property was transferred. Post-trial briefing was completed on December 10, 2007. Based on the evidence adduced at the trial, the Court makes the following factual findings.

## A. The Transfer

The Debtor raised her family, including Robert and Sherry, in a house located on the Property. In 1995, the Debtor entered into a land contract to sell the Property to another son, Jerry Stanley ("Jerry"), for $50,000. Jerry breached the land contract by, in addition to other defaults, allowing back taxes in an amount between $4,000 and $5,000 to accrue on the Property. Trial Transcript ("Tr.") at 50:3–23. The Debtor commenced eviction proceedings in state court, ultimately resulting in Jerry's eviction. Tr. at 47:5–13; 51:2–11. In June 2003, Robert, fearing that the county might attempt to seize the Property in a tax sale, paid the back taxes.

On October 3, 2003, the Debtor executed a quit-claim deed by which she transferred to Robert all of her right, title and interest in the Property "in consideration of love and affection." Trustee's Exhibit ("Trustee Ex.") 1. At the time, the Debtor was approaching 65 years of age, in poor health, and living with her aunt in the aunt's house. In addition, the house located on the Property was in poor condition; its defects included a leaky roof, leaky water pipes and gas lines, mold inside the walls, rotten floors and a furnace in need of repair. Tr. at 37:1–6; 43:24–44:11; 47:23–48:16; 68:12–22. The Debtor and Robert both testified that the purpose of the Transfer was to permit him to rehabilitate the house so that the Debtor could live there. Tr. at 22:21–23 (Robert testified that "my intent was to fix it up and that didn't happen, so that my mother

could live there ...."); Tr. at 50:21–23 (The Debtor testified that "Robert paid the taxes and he was going to—I let him have the house, he was going to fix it up so I could live there."). Robert purchased building materials for the purpose of rehabilitating the house but did not follow through with the work because, in his words, the Debtor "kind of decided it was taking a little too long, and so she said, 'Well, just forget about it[.]' " Tr. at 44:21–22. According to the Debtor, "I indicated that I didn't think he was doing anything." Tr. at 69:11–12.

In the summer of 2004, with the Debtor's knowledge, Sherry asked Robert to sell the Property to her. For approximately two weeks, Robert considered Sherry's proposal. Robert then advised her that, if he were to sell the Property, he would need to receive $5,000, which was the amount of back taxes he had paid in June 2003 plus the approximate cost of the building materials he had purchased. Tr. at 22:11–23:1; 44:25–45:22. Sherry paid the $5,000 in increments. On August 16, 2004, Robert executed a quit-claim deed by which he transferred to Sherry all of his right, title and interest in the Property "in consideration of love and affection." Trustee Ex. 2. The understanding between Robert and Sherry at the time was that Sherry would rehabilitate the house so that their mother could live there with Sherry and her children. Robert testified as follows:

Q. Why did you deed the property to your sister?

A. She approached me, asking if I would sell her the property ... [a]nd so for about a week and a half, two weeks I thought about it and I just finally said, "Okay. I'll sell it to you."

Q. Was the intent in all this to have a place for your mother to live, was that it?

A. Yes.

Q. So was there a discussion that she was going to sell it and buy another house or what, what was the discussion?

A. No, no, no discussion to that nature. She told me she had planned to fix it up as well, and then my mother would live there as well as my sister.

Tr. at 22:20–23:11. The Debtor also testified that her understanding of the reason for the transfer to Sherry was that Sherry "was going to try to get financing, and we were all going to live together." Tr. at 70:11–14. To this end, Sherry contacted at least two lenders to obtain funds to finance the project. Sherry testified that, due to the condition of the house, she was unable to obtain a home equity line of credit to finance the repairs:

Q. And I believe it was your testimony that you, it was your intent in taking the property to rehab it and provide a place for you and your mother to live?

A. Correct.

Q. And why did you not follow through with that?

A. At the time I was working and tried, I talked to a couple of different mortgage places to try to get a mortgage on it so that I could have people come out and do the work and nobody wanted to loan me any money to do that.

Tr. at 37:17–38:3.

Mark D. Wall and Janet Wall subsequently offered Sherry $20,000 for the Property. The Walls were not family members of Sherry, Robert or the Debtor. Sherry knew the Walls because they were her landlords. After another party offered Sherry $25,000, the Walls increased their offer to $40,500. Tr. at 38:19–39:3; 41:13–42:12. At trial, Sherry speculated that the Walls might have been interested in the Property because "it was a very large lot and it was a good size house." Tr. at 39:22–23. On February 18, 2005, Sherry executed a general warranty deed by which she transferred the Property to the Walls "in consideration of One Dollar ($1.00) and other good and valuable consideration paid." Trustee Ex. 3. The Walls paid $40,500 for the Property. At closing, Sherry received $38,401.73 after deductions. None of those funds went to Robert or to the Debtor. Tr. at 40:16–19. Instead, Sherry used a portion of the proceeds to make a down payment on another house (other than the one she was renting from the Walls) for which the purchase price was $146,123. She also used a portion of the proceeds to purchase furniture, curtains and window blinds for the new house. When Sherry and her children moved into the house, the Debtor moved in with them on a rent-free basis. As of the date of the trial, the Debtor still lived with Sherry.

## B. The Debtor's Financial Condition at the Time of the Transfer

The Trustee contends that the Debtor was solvent prior to the Transfer but became insolvent as a result of it. In particular, the Trustee argues that the Debtor was insolvent after the Transfer because she generally was not paying her debts as they became due. In light of these arguments, the Court will review the evidence regarding the Debtor's assets, liabilities and debt payment history as of the date of the Transfer.

### 1. The Debtor's Assets

After the Transfer, the Debtor's only remaining assets were items of personal property. The Debtor testified that she owned the same assets on the Petition Date that she owned at the time of the Transfer and that the value of the assets as of the Petition Date was "roughly" the value listed in her bankruptcy schedules—

approximately $6,220. Tr. at 65:2. She testified:

Q. All right and when you filed you listed assets totaling $6,220. Let me read those off to you. You said you had cash on hand of $20. A Huntington National Bank account at $200. Household goods and furnishings valued at $300. Clothing valued at $100. A cocktail ring valued at $400. Term life insurance with no cash value. And a [2002] Hyundai automobile valued at $5,200. And that's the total of assets you listed. Was that an accurate statement of what you owned at that time?

A. Yes. Figuring it roughly at the time, yes.

Q. And is that basically what you owned back when you transferred—

A. Yes.

Q. —your house to your son Robert?

A. Um-hum.

Q. Your assets hadn't changed much during that period of time?

A. Not really. I don't have any more furniture than I did, you know, or anything.

Tr. at 64:16–65:12. The Debtor was not questioned about and did not testify regarding the value of the assets at the time of the Transfer.

### 2. The Debtor's Liabilities

The evidence showed that the Debtor's liabilities generally fell into three categories—indebtedness on account of health care services, indebtedness for credit card purchases and indebtedness for the financing of her automobile.

In 2002—prior to the Transfer—the Debtor underwent a number of medical procedures. Tr. at 57:4–9. At the time, the Debtor was covered by Medicare, but Medicare paid only 80% of her medical bills, and the Debtor was liable for the remaining 20%. The medical providers filed proofs of claim in liquidated amounts. During the trial, counsel for the Trustee questioned the Debtor about these proofs of claim without providing her with copies of them. Nor did counsel for the Trustee offer copies of the proofs of claim as exhibits. The Debtor's testimony regarding these bills, which she had incurred four years earlier, was not definitive. For example, when asked whether she had paid a $1,030.76 bill that was the subject of a particular proof of claim, the Debtor answered, "[n]ot if you have it there I didn't[,]" Tr. at 59:10, and "[w]hatever you have there is what I haven't paid, I didn't pay." Tr. at 59:17–18. The Debtor's testimony showed that, as of the Petition Date, one provider asserted that she owed $1,030.76, for which it filed one proof of claim, and an additional $3,794.10, which is evidenced by a second proof of claim. Tr. at 58–59. In addition, the evidence showed that other health care providers asserted that she owed $8.34 (about which the Debtor testified "[t]hem I owe for radiology if you say so[,]" Tr. at 60:8–9), $164, Tr. at 85:20–22, and $123.36, Tr. at 66:13–67:3. The Trustee failed to elicit testimony or introduce any other evidence regarding whether these amounts were the principal amount of the debts or whether they included interest, late fees or other charges.

The Trustee did not introduce any evidence regarding the amount of the Debtor's liability on her credit cards at the time of the Transfer. The Debtor testified that her car payment at the time was $252.83 per month, Tr. at 61:2–62:5, but did not testify about the total amount she owed on the car loan at the time of the Transfer. The Debtor did testify that she owed a small debt to JCPenney that was past due from some time before 1995. The evidence showed that JCPenney filed a proof of claim in the amount of $235.18, but the

Debtor stated that she believed the amount to be around $60. Tr. at 67:5–9; 84:25–85:10.

### 3. The Debtor's Debt Payment History

As of the date of the Transfer, the Debtor was paying little or nothing on her debts to her health care providers. She testified that she might have made some payments to one provider, but that if she had, the payments would have been small in amount:

Q. In fact, have you ever paid anything that—on your medical bills that Medicare didn't pay?

A. I probably have at different times but I don't remember—I had so much going on, I don't remember what's—

Q. But you specifically—

A. I was also paying for my medication at the time.

. . .

Q. Okay. But you didn't pay that balance due?

A. That was the secondary part.

Q. Yeah and you didn't pay that?

A. No.

Q. All right.

A. I may have paid at different times but probably not that much.

Tr. at 57:17–59:2.

The Debtor, however, testified that she was making her car and credit card payments at the time of the Transfer:

Q. Were you, once again if you recall, was it your practice or did you make a habit of paying something on bills as you got them even if you couldn't pay them in full during that timeframe?

A. I paid my car payment and things, if you're talking about that timeframe.

Q. Yes.

A. When I was still getting my disability and my Social Security.

Q. And your disability, your private disability, ceased almost a year to the date of the transfer of the property to your son, Robert, correct?

A. Well, let's see,—

Q. We—

A. —that would be three years ago, so it would have been about 2003.

Q. Okay.

A. 2004, I don't know.

Q. So you turned 65 in October of 2004?

A. Right.

Q. And when you turned 65, that's when your disability, your private disability ceased, is that correct?

A. Yes.

Tr. at 76:22–77:21.

Q. The other—with respect to the other debts that you listed in your schedules, were—did you owe any of those monies back in 2002? The credit cards? I know you had the car payment back then but any other debts, were those still—

A. I may have had the credit cards.

Q. Were you making your current monthly payments on those?

A. Yes.

Q. All right. So you were current on your credit card payments back in—at the time you transferred the property in 2003?

A. Yes, I'm pretty sure.

Q. All right. Did you have any other debts that you were behind on back in 2003 when you—

A. Mostly just the debts that I was behind on at the time were maybe the secondaries on the hospital bill or something.

Q. So the unpaid amount on the bills that weren't picked up by Medicare?

A. Right.

Tr. at 83:20–84:16.

After the Transfer, the Debtor had income of between $300 to $400 per month in Social Security Disability payments and $635 per month in private disability payments. Tr. at 74–75; 81:19–81:25. The Debtor's private disability insurance payments—which were approximately $635 a month—ended when she turned sixty-five in October 2004. The reduction in the Debtor's income was partially offset by payments from a retirement plan in the amount of $107 per month that began about the same time her disability payments ended. This occurred approximately one year after the Transfer. A death benefit of approximately $700 per month did not begin until her former husband died in May 2007. Tr. at 78:3–5; 81:19–83:13.

## IV. Arguments of the Parties

The Trustee asserts that the Transfer is avoidable as both an actual and constructive fraudulent transfer. With respect to actual fraud, the Trustee argues that the Transfer was a transfer (1) to an insider, (2) of substantially all of the assets of the Debtor, (3) for less than reasonably equivalent value, and (4) that caused the Debtor to become insolvent. The Trustee contends that the existence of these four "badges of fraud" shifts to the Defendants the burden of proving that the Transfer was not fraudulent. As to his constructive fraud claim, the Trustee again argues that

the Transfer was for less than reasonably equivalent value and that it caused the Debtor to become insolvent. The Trustee also argues that the Debtor was insolvent under Ohio law in that she generally was not paying her debts as they became due, *i.e.*, she was not paying her bills to her medical providers and had not paid a bill to JCPenney. The Trustee also contends that the Debtor was insolvent on a balance-sheet basis:

> As shown by her Bankruptcy Schedules, her total liabilities, at the time of filing, were $29,311.17. And, her assets and liabilities were basically the same when she transferred her real estate to her son Robert as when she file[d] Bankruptcy (Transcript pgs 64 & 65). Also, as shown by Plaintiff's Exhibit 4, a net of $38,401.73 was received from the sale of the real estate on February 18, 2005. In other words, before the Debtor gave the real estate to her son Robert, she was solvent, in that she could have paid off all her debt from the proceeds of a sale of the subject real estate. After the transfer, she was insolvent, and eventually filed Bankruptcy.

Trustee's Post–Trial Br. ("Trustee's Br.") (Doc. 29) at 5–6. In addition, the Trustee argues that the Transfer was constructively fraudulent because the Debtor reasonably should have believed that after the Transfer she would incur debts beyond her ability to pay as they became due. According to the Trustee, the Transfer is therefore avoidable under § 544(b)(1) of the Bankruptcy Code and Ohio Revised Code §§ 1336.04 and 1336.05 [1] and may be

---

**1.** Under 11 U.S.C. § 548(a)(1), as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), a trustee may avoid fraudulent transfers made on or within two years before the petition date. But in bankruptcy cases—such as the Debtor's—commenced before the effective date of the relevant BAPCPA amendment, a

trustee may use § 548(a)(1) to avoid fraudulent transfers made within one year before the filing of the petition. In this adversary proceeding, the Trustee does not rely on § 548(a)(1), apparently because the initial transfer from the Debtor to Robert was made more than a year prior to the Petition Date.

recovered from the Defendants under 11 U.S.C. § 550. The Trustee seeks avoidance and recovery of $33,401.73, which is the net amount received by Sherry in the sale to the Walls minus the $5,000 Robert invested in the Property.

In response, the Defendants argue that the Trustee did not plead actual fraud and that the Court, therefore, should not consider the badges of fraud. But even if the Court does so, they contend that the badges of fraud should not shift the burden of proof to them and do not support a finding of actual fraud. The Defendants point to the fact that the house on the Property was in serious disrepair and that the purpose of the Transfer was not to hide or conceal the Property from the Debtor's creditors but to rehabilitate the house so the Debtor could live there. They also argue that the evidence regarding the Debtor's financial condition showed only what her financial condition was as of the Petition Date and that the evidence was insufficient to prove that the Debtor was insolvent when the Transfer occurred nearly two years earlier. The Defendants also assert that the Debtor was paying most of her bills and, therefore, was generally paying her debts as they became due. In addition, they maintain that the Debtor's income at the time of the Transfer was sufficient to service any future debt that she might incur and that there was no evidence that the Debtor intended to incur, or believed that she would incur, debts that would be beyond her ability to pay. The Defendants also submit that the Trustee failed to prove the value of the Property at the time of the Transfer and, thus,

did not establish the amount that would be recoverable under § 550 if the Court were to find that the Transfer is avoidable. Finally, Sherry argues that, by fulfilling her promise to provide a place for the Debtor to live, she provided reasonably equivalent value for the transfer of the Property to her.

## V. Legal Analysis

### A. Section 544(b)(1) of the Bankruptcy Code

Section 544(b)(1) of the Bankruptcy Code provides as follows:

> [T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1).

Under § 544(b)(1), "a trustee has the right to avoid any transfer of property of a debtor or any obligation incurred by a debtor that is voidable under applicable law by an unsecured creditor of the debtor." *Bash v. Sun Trust Banks, Inc. (In re Ohio Bus. Machines, Inc.)*, 2007 WL 177941 at *4 (6th Cir. BAP Jan. 25, 2007) (applying Ohio Uniform Fraudulent Transfer Act).[2] As in *Ohio Business Machines*, Ohio's fraudulent transfer law applies to this adversary proceeding.

### B. Actual Fraud

 In support of her actual fraud cause of action,[3] the Trustee relies on the

---

**2.** The Ohio Uniform Fraudulent Transfer Act is codified at Ohio Rev.Code Ann. §§ 1336.01–1336.11 (West 2008).

**3.** The Defendants argue that the Trustee should be barred from asserting actual fraud because she did not properly plead it in her

complaint. The Court need not decide whether the Trustee's complaint sufficiently stated a claim for actual fraud. Some of the evidence adduced at trial went to the issue of actual fraud, including the badges of fraud. If necessary, the Court could permit the complaint to be amended to conform to the evidence.

provision of Ohio law under which a transfer "is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation ... [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." Ohio Rev.Code Ann. § 1336.04(A)(1). "Actual intent" may be present whether the transfer was motivated entirely or merely in part by a desire to hinder, delay or defraud creditors. *See Spearing Tool & Mfg. Co. v. Buccaneer Tool & Die Co. (In re Spearing Tool & Mfg. Co.)*, 171 B.R. 578, 582 (Bankr.E.D.Mich.1994). The Trustee bears the burden of proving the Debtor's actual fraudulent intent by clear and convincing evidence. *See Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 635 (Bankr.S.D.Ohio 2006); *see also Stein v. Brown*, 18 Ohio St.3d 305, 480 N.E.2d 1121, 1124 (1985) ("It is rudimentary that the issue concerning fraudulent intent is to be determined in view of the facts and circumstances of each case. The burden of proof in an action to set aside a fraudulent conveyance must be affirmatively satisfied by the complainant.").

■■■ "Because proof of actual intent to hinder, delay or defraud creditors may rarely be established by direct evidence, courts infer fraudulent intent from the circumstances surrounding the transfer." *Schilling v. Heavrin (In re Triple S Rests., Inc.)*, 422 F.3d 405, 416 (6th Cir. 2005) (internal quotation marks omitted); *see also Canyon Sys.*, 343 B.R. at 636 ("A finding of intent to hinder, delay or defraud creditors may be made on the basis of circumstantial evidence, as direct proof of the debtor's fraudulent intent will rarely be available."). Circumstantial evidence includes the so-called badges of fraud. In Ohio, the badges of fraud include the eleven factors set forth in § 1336.04(B)(1)-(11):

(B) In determining actual intent under division (A)(1) of this section, consideration may be given to all relevant factors, including, but not limited to, the following:

(1) Whether the transfer or obligation was to an insider;

(2) Whether the debtor retained possession or control of the property transferred after the transfer;

(3) Whether the transfer or obligation was disclosed or concealed;

(4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

(5) Whether the transfer was of substantially all of the assets of the debtor;

(6) Whether the debtor absconded;

(7) Whether the debtor removed or concealed assets;

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) Whether the debtor was insolvent or became insolvent shortly after the trans-

---

*See* Fed.R.Civ.P. 15(b)(1) (made applicable here by Fed. R. Bankr.P. 7015) ("If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits."). Here the Defendants were not prejudiced— they were prepared to testify and did testify fully regarding the circumstances surrounding the transfers of the Property. The Court, therefore, would permit an amendment of the complaint if it were necessary. Given that the Defendants are the prevailing parties, it is not.

fer was made or the obligation was incurred;

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;

(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

Ohio Rev.Code Ann. § 1336.04(B).

The existence of a sufficient number of badges of fraud shifts the burden to the defendant to prove the absence of fraudulent intent and to show that there was a legitimate purpose for the transfer. "[I]f there are 'badges of fraud' which cast suspicion on the transaction, the burden of proof shifts to the defendant to explain the transaction and show that it was not fraudulent." *See Triple S Rests.*, 422 F.3d at 414 (internal quotation marks omitted). *See also Kelly v. Armstrong*, 206 F.3d 794, 798 (8th Cir.2000) ("If there is a confluence of the 'badges of fraud,' then the Trustee is entitled to a presumption of fraudulent intent. To overcome the presumption, a 'legitimate supervening purpose' for the transfers must be shown by the bankrupt." (citation omitted) (internal quotation marks omitted)); *Welt v. Jacobson (In re Aqua Clear Techs., Inc.)*, 361 B.R. 567, 582 (Bankr.S.D.Fla.2007) (badges of fraud caused the "burden of producing evidence [to] shift[ ] to the transferee to demonstrate that the Debtor received a benefit or that there was some legitimate purpose for the transfer"); *Silagy v. Gagnon (In re Gabor)*, 280 B.R. 149, 157 (Bankr.N.D.Ohio 2002) ("Badges of fraud can raise presumptions of actual fraudulent intent, and the presumptions can establish a prima facie case and shift burden to debtor to establish the absence of fraudulent intent.") (citing *Staats v. Harper (In re Harper)*, 132 B.R. 349, 353 (Bankr.S.D.Ohio 1991)).

There is no hard-and-fast rule regarding the number of badges of fraud that must be present before the burden shifts. "Although the presence of a single badge may only raise the suspicion of debtor's fraudulent intent, the confluence of several badges can be conclusive evidence of fraudulent intent, absent significantly clear evidence of debtor's legitimate supervening purpose." *Gabor*, 280 B.R. at 157; *see also Atl. Veneer Corp. v. Robbins*, 2002 WL 31230338 at *4 (Ohio Ct.App. Sept.27, 2002) ("Once a creditor demonstrates a sufficient number of these 'badges of fraud' with regard to a transfer, the burden of proof shifts to the debtor to prove that the transfer was not fraudulent.").

The evidence adduced at trial established the existence of two badges of fraud. First, the Debtor made the Transfer for less than reasonably equivalent value; she made the Transfer so that Robert could refurbish the house and because Robert had paid the back taxes on the Property. The refurbishing of the house never occurred, and therefore does not constitute value. *See* Ohio Rev.Code Ann. § 1336.03(A) ("[V]alue does not include an unperformed promise made otherwise than in the ordinary course of the business of the promisor to furnish support to the debtor or another person."). Robert's payment of the back taxes may count as value, but it was not reasonably equivalent value. "In assessing whether a challenged transfer is supported by reasonably equivalent value, courts generally compare the value of the property transferred with the value of that received in exchange for the transfer." *Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 707 (6th Cir.1999); *see also Canyon Sys.*, 343 B.R. at 639. The parties dispute the value of the Property for purposes of determining the amount recoverable by the Trustee under § 550. The

Court, however, need not determine the precise value of the Property. The evidence shows that the house and the lot on which it sat were large and that, even though the house was in poor condition, offers of $20,000 and $25,000 were made for it, ultimately resulting in its sale in early 2005 for $40,500. The Court, therefore, has no difficulty finding that the payment of $4,000 to $5,000 in back taxes at a time when there were no other liens on the Property did not constitute reasonably equivalent value. The Debtor obviously had equity in the Property in excess of $5,000 and was not compensated for that equity merely by Robert's payment of the back taxes. *See Gabor,* 280 B.R. at 159 ("Whatever the true value of the property may have been, the court finds the debtor lost substantial amounts of the accumulated equity in his home. . . . Debtor did not receive anything [reasonably equivalent to] his substantial equity.").

■■■■ The second badge of fraud present here is that the Debtor transferred the Property to her son, Robert, who is an insider for purpose of the statute. *See* Ohio Rev.Code Ann. § 1336.01(G)(1)(a) (insider of individual debtor includes a relative of the debtor). "Transfers between spouses or between family members are suspect and subject to the strictest scrutiny, particularly when the consideration exchanged appears to be inadequate." *Harper,* 132 B.R. at 354. When one family member transfers property to another family member for less than fair value and then files a bankruptcy petition, the courts have had no trouble finding actual intent to defraud creditors under the right circumstances. *See, e.g., Gabor,* 280 B.R. at 158. Under the circumstances present here, the Court finds that it is appropriate to shift to the Defendants the burden of proving the absence of fraudulent intent and a legitimate purpose for the transfer of the Property. They have met their burden.

■■■ The Defendants testified, as did the Debtor, that the purpose of the Transfer was to facilitate Robert's rehabilitation of the house so that the Debtor would have a habitable residence. The Trustee did not rebut this testimony, and the Court finds it to be credible.[4] It makes sense for Robert to acquire the Property if he were going to oversee its refurbishing. The fact that Robert purchased building materials (for which Sherry later reimbursed him) bolsters his contention he acquired the Property in order to repair the house. And in the end, even though Robert did not make the repairs, Sherry, through her own transfer of the Property, ultimately provided a place for the Debtor to live.

While Sherry did sell the Property to non-family members for valuable consideration, Robert testified that there were no discussions suggesting that the Debtor's or Sherry's purpose all along was to sell the Property outside of the family. Rather,

4. The Trustee states that "[t]here was also testimony, but no documentation or proof (See [Ohio Revised Code] 1335.05) of any binding agreement, that the purpose of the transfers to Robert and to Sherry Stanley were for the purpose of providing a suitable place for their mother, the Debtor, who was permanently disabled, to live." Trustee's Br. at 3. The section of the Ohio Revised Code on which the Trustee relies is Ohio's version of the Statute of Frauds. It states in part that "[n]o action shall be brought . . . to charge a person . . . upon a contract or sale of lands, tenements, or hereditaments, or interest in or concerning them . . . unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith. . . ." This provision might apply if this were an action against the Defendants to enforce their agreement with the Debtor, but that is not the case. The Statute of Frauds has no bearing on the issue of the Debtor's intent in transferring the Property to Robert.

the testimony showed that it was the intent of both the Debtor and Sherry that Sherry would obtain a loan to finance the home repairs. The fact that Sherry approached lenders in an attempt to obtain a loan supports the testimony that this was the purpose of the transfer to Sherry. If the Trustee had presented evidence that the Debtor transferred the Property to Robert, or that Robert transferred it to Sherry with knowledge that the Walls were interested in purchasing the Property, then this might be some evidence of an intent to defraud creditors. The Property, however, was in serious disrepair, and there was no evidence that the Debtor or the Defendants knew at the time of the transfers that there would be a buyer for it nearly two years later. Further, Sherry transferred the Property out of the family only after attempting for nearly six months—ultimately unsuccessfully—to obtain the financing necessary to put it in a safe condition so that the Debtor could live there.

When it became clear that Sherry was unable to finance the repairs and that the Walls were willing to purchase the Property, Sherry could have conveyed the Property back to her mother in exchange for the $5,000 Sherry had paid Robert, and the Debtor then could have been the one who sold the Property to the Walls. Under that scenario, the Debtor would have received the net proceeds of $38,401.73. If the Debtor had then transferred those proceeds to Sherry for the purchase of the new house, the Trustee might have sought to avoid that transfer. The existence of

badges of fraud would have shifted the burden to the Defendants to prove that the Debtor did not intend to defraud her creditors and, on those facts, that burden might have been more difficult to meet. But the Court looks to the Debtor's actual intent at the time of the transfer to Robert in October 2003, not what her intent might have been in a hypothetical situation nearly two years later.

■ In addition to the evidence of a legitimate purpose for the Transfer, consideration of other factors, including the absence of the other badges of fraud, supports the view that the Debtor did not have any actual intent to defraud her creditors. First, there is no evidence that the Debtor controlled the Property after she transferred it to Robert. The testimony showed that she was aware of and did not object to Robert transferring the Property to Sherry, but there was no evidence that the Debtor had the legal right to force the transfer to Sherry or would have had any right to veto it. Robert's testimony was that he considered Sherry's proposal for approximately two weeks and then named the price for the transfer. He is the one who had dominion of the Property at that point. *See Taunt v. Hurtado (In re Hurtado),* 342 F.3d 528, 535 (6th Cir.2003).[5] Second, the Debtor did not attempt to conceal the Transfer. The deed to Robert states that the Transfer was made "in consideration of love and affection" and does not suggest that any valuable consideration was paid. This recorded statement is additional evidence of the Debtor's lack of intent to defraud. *See Nelson v.*

---

**5.** In *Hurtado,* the Sixth Circuit held that the trustee could recover a fraudulent transfer from the debtor's mother despite the mother's argument that she was a "mere conduit" of the transfer. The court of appeals so held because the mother had control over the property transferred. *See id.* at 535. ("Barbara Hurtado here *was* given legal title to the

funds.... With that established, Barbara Hurtado had legal authority to do what she liked with the funds.... [S]he points to no legal recourse that the debtors would have had if she had chosen to use the funds to her own benefit. The fact that she did not choose to use the funds in that manner in no way undercuts the fact that she had that ability.").

*United States,* 821 F.Supp. 1496, 1502 (M.D.Ga.1993) ("The court wonders why a person who is trying to delay or defraud his creditors would put 'For love and affection' as the consideration for the transfer of the property? It does not seem logical. Surely a person who sought to defraud his creditors would invent some sort of valuable consideration, at least to show on the recorded instrument. That is not the case here.").

Moreover, there is no evidence that the Debtor's creditors had commenced or threatened to commence a lawsuit against the Debtor or that the Debtor transferred the Property to Robert as a result of any actual or threatened lawsuit. The Debtor incurred most of her debts to her medical providers in 2002 but did not transfer the Property until more than a year later. And the Transfer does not appear to have been a transfer of substantially all of the assets of the Debtor. After the Transfer the Debtor's assets included her personal property assets, which she valued at approximately $6,220.

Finally, the Debtor testified that at the time of the Transfer she was not contemplating bankruptcy. Tr. at 70:17–20. While this could be viewed as merely self-serving, the fact remains that the Debtor did not file her bankruptcy petition until nearly two years after the Transfer. This further bolsters the Defendants' claim— which they have demonstrated—that there was a legitimate purpose for the Transfer. *See Shamban v. Prichard (In re Prichard),* 361 B.R. 11, 18 (Bankr.D.Mass.2007) ("The question then becomes whether Thomas and Karen presented sufficient evidence of a legitimate supervening purpose for the transfer of the Property, such as to rebut the indication that Thomas and Karen effected the transfer of the Property with fraudulent intent. The testimony of both Thomas and Karen established that the transfer occurred following a period of time during which they were suffering through marital difficulties. Karen testified that the reasons for her legally assuming the obligations for the Property was to be able to continue to provide a home for the children, and because 'the marriage was over' and Thomas 'didn't want any part of it.'... To conclude now that this transaction was some sort of sham would require that I find that Thomas and Karen staged their marital difficulties.... The evidence does not so prove and I do not so conclude." (citations omitted)); *In re Agnew,* 355 B.R. 276, 286 (Bankr.D.Kan.2006) ("[A]ny inference of fraud from these factors is de minimis in light of other factors negating fraud. Of primary importance is th[e] fact that the exchange fulfilled a legitimate estate planning purpose which Debtor had discussed with his mother long before bankruptcy was a possibility; it fulfilled a purpose other than bankruptcy planning.").

Taken together, the facts and circumstances overcome the presumption raised by the badges of fraud. *See Official Unsecured Creditors Comm. of Long Dev., Inc. v. Oak Park Village Ltd. P'ship (In re Long Dev., Inc.),* 117 F.3d 1420 (table), 1997 WL 377055 at *7 (6th Cir.1997) (evidentiary strength of badges of fraud was sufficiently "diluted" by the defendant's "counter-showing" that, among other things, "the company continued operating for nearly three years before it filed for bankruptcy protection"). In the end, the Court's determination that the Defendants proved lack of actual intent to defraud derives from its careful consideration of the facts. Also important is the Court's assessment of the credibility of the witnesses. The Court found their testimony regarding the purpose of the Transfer to be credible and sincere. And the Trustee neither impeached them nor introduced any evidence discrediting their testimony. The Court accordingly finds that the Defendants rebutted the presumption raised

by the badges of fraud. *See Schilling v. Montalvo (In re Montalvo)*, 333 B.R. 145, 149 (Bankr.W.D.Ky.2005) ("The Court found both Debtor and his wife to be credible witnesses. The Trustee simply produced no countervailing evidence to discredit their testimony or to prove that the transfers were fraudulent."); *Hoffman v. Boyd (In re Boyd)*, 264 B.R. 62, 67 (Bankr. D.Conn.2001) ("[D]eterminations of fraudulent intent are issues of fact. As such, the credibility of the witnesses and plausibility of their explanations are often the determinative factors."). Based on the evidence, the Court finds that the Debtor's actual intent and legitimate purpose when she transferred the Property to Robert was to facilitate Robert's rehabilitation of the Property so that she could live there— not to hinder, delay, or defraud any of her creditors. Hence, the Trustee may not avoid the Transfer as an actual fraudulent conveyance.

## C. Constructive Fraud

 The Trustee also asserts that she is entitled to avoid the Transfer on the basis of constructive fraud. In support of her constructive fraud claim, the Trustee relies on both § 1336.04(A)(2) and § 1336.05 of the Ohio Revised Code.[6] Under these statutory provisions, the purpose of the Transfer and the Debtor's intent are irrelevant. *See SEC v. Antar*, 120 F.Supp.2d 431, 443, 445 (D.N.J.2000) (testimony that purpose of transfer was to provide a place to live was irrelevant for purposes of constructive fraudulent conveyance action), *aff'd*, 44 Fed.Appx. 548 (3d Cir.2002); *United States v. Jones*, 877 F.Supp. 907, 914 (D.N.J.) (same), *aff'd*, 74 F.3d 1228 (3d Cir.1995). The plaintiff need only prove by a preponderance of the evidence two elements of constructive fraud. *See Canyon Sys.*, 343 B.R. at 638; *Sease v. John Smith Grain Co.*, 17 Ohio App.3d 223, 479 N.E.2d 284, 288 (1984) ("In order to establish a fraudulent conveyance under either [Ohio Revised Code] 1336.04 or 1336.05, a creditor must prove that the debtor was insolvent or would be made so by the transfer in issue and that the transfer was made without fair consid-

---

**6.** Section 1336.04(A)(2) provides in pertinent part as follows:

(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation ...

. . . .

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

(a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

(b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Ohio Rev.Code Ann. § 1336.04(A)(2).

Section 1336.05 of the Ohio Revised Code provides as follows:

(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(B) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the transfer was made to or the obligation was incurred with respect to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Ohio Rev.Code Ann. § 1336.05.

eration. If both of these burdens are met, the transfer is fraudulent as a matter of law. Neither the intent of the debtor nor the knowledge of the transferee need be proven."). The first element is the receipt by the debtor of less than reasonably equivalent value. As discussed above, the Debtor did not receive reasonably equivalent value for the Transfer.

Proof that the Transfer was made in exchange for less then reasonably equivalent value only gets the Trustee half way. She also must make a showing of the Debtor's impaired financial condition. Under § 1336.04, the required showing is that the Debtor: (i) "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," Ohio Rev.Code Ann. § 1336.04(A)(2)(a); or (ii) "intended to incur, or believed or reasonably should have believed that [she] would incur, debts beyond [her] ability to pay as they became due." *Id.* at § 1336.04(A)(2)(b). At trial, the Trustee proved neither. She made no showing that at the time of the Transfer the Debtor was engaged or about to engage in a business or a transaction of any kind, let alone one for which her remaining assets would be unreasonably small. The Trustee, therefore, has not established this element of a constructive fraudulent transfer. *See Manera v. KnotKnown Records, Inc. (In re Jones),* 2008 WL 565267 at *5 (Bankr.D.Ariz. Feb.28, 2008) ("[T]he Trustee must prove either that the Debtor was engaged in a business with unreasonably small capital or intended to incur debts beyond her ability to pay.... The Trustee did not introduce evidence on any of these points; lacking this essential evidence, the fraudulent conveyance count must fail." (citations omitted)). The Trustee also made no showing that, after the Transfer, the Debtor intended to incur, believed, or reasonably should have believed that she

would incur, any debts beyond her ability to pay as they came due. Given this failure of proof of showing, the Trustee cannot prevail on the basis of debt incurrence. *See Esteco, Inc. v. Kimpel,* 2007 WL 4696855 at *4 (Ohio Ct.App. Dec. 20, 2007) ("In this case, there is no evidence that the transfer was fraudulent under [Ohio Revised Code § ] 1336.04(A)(2)(b) since there is no indication that [the transferor] intended to incur further debt after the transfer. The debt that [the plaintiff] points to is the debt already incurred to [the plaintiff].").

■ That leaves § 1336.05. Under this provision, a transfer constitutes a constructive fraudulent transfer with respect to the Debtor's existing creditors (such as her medical providers) if it was made—as the Transfer was—for less than reasonably equivalent value, and if the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer. A crucial issue, therefore, is which party bears the burden of proof on the insolvency issue under Ohio law. Consistent with the general rule that the plaintiff bears the burden of proof on the elements of a cause of action, many courts in this district, including this Court, have held that the trustee bears the burden of proving the debtor's insolvency at the time of the transfer. *See Canyon Sys.,* 343 B.R. at 647 (holding that the trustee bears the burden of proof with respect to the issue of insolvency under Ohio law); *Kovacs v. Berger (In re Berger),* 2007 WL 2462646 at *7 (same); *Gabor,* 280 B.R. at 160 (same); *In re Taubman,* 160 B.R. 964, 979 (Bankr. S.D.Ohio 1993) (same). Similarly, some Ohio courts appear to have assumed this to be the rule. *See, e.g., Sease,* 479 N.E.2d at 289. Other courts have held that where the trustee has shown "lack of consideration," the burden shifts to the defendants to prove that the debtor was solvent at the

time of the transfer. *See United States v. Berman,* 1988 WL 126557 at *3 (S.D.Ohio 1988) ("[In] *Oliver v. Moore,* 23 Ohio St. 473 (1872), [the Ohio Supreme Court] stated in paragraph 4 of the syllabus: 'In an action taken by a creditor for the purpose of subjecting property in the hands of a donee to the payment of his claim, it being made to appear that the debt was contracted by the donor prior to the making of the gift, the burden of showing the solvency at the time of making the gift rests upon the defendant.' "), *aff'd,* 884 F.2d 916 (6th Cir. 1989). *See also Toledo Trust Co. v. Poole (In re Poole),* 15 B.R. 422, 428 (Bankr. N.D.Ohio 1981) (applying *Oliver v. Moore); MacQueen v. Dollar Sav. Bank, Co.,* 133 Ohio St. 579, 15 N.E.2d 529, 532 (1938) ("The burden of proving solvency at the time of transfer rested on the defendant."). In *Oliver,* the transfer from husband to wife was a gift for no consideration at all. *See Oliver,* 23 Ohio St. at 478. In *Poole,* the alleged consideration was the purported resolution of marital difficulties between the husband-transferor and the wife-transferee; the court held that this was not valid consideration. *See Poole,* 15 B.R. at 430. In *Berman,* the alleged consideration was the potential profits that the transferor might reap in the future from the transferee's business activities on the real property that was transferred. *See Berman,* 1988 WL 126557 at *2. And in *MacQueen,* the transfer of corporate property was made to secure a loan from a bank to a shareholder of the corporation— the corporation itself received no consideration. *See MacQueen,* 15 N.E.2d at 530. Here, by contrast, Robert gave some consideration to the Debtor in the form of the payment of back taxes. Because this case does not involve a complete "lack of consideration," the Court applies the rule set forth in *Canyon Systems, Berger, Gabor* and *Taubman,* and concludes that the

burden of proving insolvency of the Debtor remained with the Trustee.

■ The Trustee contends that the Debtor was solvent at the time of the Transfer but became insolvent as a result of the Transfer. Under Ohio law, a debtor is insolvent if she is insolvent on a balance-sheet basis (*i.e.,* her assets exceed her liabilities at a fair valuation) or if she generally is not paying her debts as they become due. *See Esteco,* 2007 WL 4696855 at *4 ("There are two definitions of insolvency in Ohio's Uniform Fraudulent Transfer Act.... A debtor is insolvent if the sum of the debts of the debtor is greater than all of the assets of the debtor at a fair valuation [and][a] debtor who generally is not paying his debts as they become due is presumed to be insolvent." (internal quotation marks omitted)).

■ One approach to demonstrating that the Debtor was insolvent on a balance-sheet basis at the time of the Transfer would have been to establish the value of the Debtor's assets and the amount of her liabilities at that time. But the Trustee did not make that showing. The Trustee asked the Debtor what she owned at that time, and she testified that she owned the same assets on the Petition Date that she owned when she transferred the Property to Robert. She also testified that the value of those assets as of the Petition Date was $6,220. She did not, however, testify to the value of the assets as of the date of the Transfer.

The Trustee's evidence regarding the Debtor's liabilities at the time of the Transfer was equally deficient. The Debtor testified about the amounts that claimants asserted were due as of the Petition Date, but the Trustee failed to introduce any evidence regarding the actual amount of the liabilities at the time of the Transfer. For example, the Trustee did not address the possibility that the amounts

asserted in the providers' proofs of claim included interest, late fees or other charges that were not owing as of the date of the Transfer. Similarly, the Trustee elicited testimony regarding the amount of the monthly payment on the Debtor's car loan but introduced no evidence regarding the total amount due on the loan as of the date the Debtor transferred the Property to Robert. Likewise, the Trustee introduced no evidence regarding the amount of the Debtor's liability on her credit cards at the time of the Transfer.

■■■■ True, "[i]nsolvency is not always susceptible to direct proof and frequently must be determined by proof of other facts or factors from which the ultimate fact of insolvency on the transfer dates must be inferred or presumed." *Dahar v. Jackson (In re Jackson)*, 318 B.R. 5, 16 (Bankr.D.N.H.2004), *aff'd*, 459 F.3d 117 (1st Cir.2006). Retrojection is one method used to prove insolvency indirectly. As its name suggests, retrojection is the inverse of projection. A retrojection analysis begins with a debtor's financial condition at a certain point in time (typically the petition date) and extrapolates back in time in an attempt to show that the debtor must have been insolvent at some earlier relevant time (*e.g.*, the date of an alleged fraudulent transfer). The Trustee did not use the term "retrojection," but that essentially is the approach she used at trial. She relied on the Debtor's schedule of assets and on the proofs of claim filed by certain of the Debtor's creditors, augmented somewhat by the Debtor's testimony.

■■■ The Trustee's retrojection analysis fails for two reasons: because the Debtor's financial situation changed significantly between the date of the Transfer and the Petition Date (for reasons unrelated to the Transfer) and because the Petition Date is too far removed in time from the date of the Transfer. First, "[w]hen [retrojection] is sought to be invoked, it is essential the trustee be able to show the absence of any substantial or radical changes in the assets or liabilities of the bankrupt between the retrojection dates." *Id.; see also Parlon v. Claiborne (In re Kaylor Equip. & Rental, Inc.)*, 56 B.R. 58, 62 (Bankr.E.D.Tenn.1985) ("In proving the insolvency of the debtor, a trustee may meet his burden of proof by showing that the debtor was insolvent at a reasonable time subsequent to the date of the alleged transfer, accompanied by proof that no substantial change in the debtor's financial condition occurred during the interval."). But according to the Debtor's testimony, her financial situation changed significantly between the time she transferred the Property to Robert and the time she filed her Chapter 7 petition. In particular, she experienced a reduction in her income of $635 per month when her private disability insurance ended in October 2004, a reduction that was immediately offset, but only partially, by payments from a retirement plan in the amount of $107 per month. Second, the Trustee's attempt to use retrojection to go back nearly two years in time stretches retrojection analysis past its breaking point. Retrojection can be used to go back days, weeks or even several months in time. *See Briden v. Foley*, 776 F.2d 379, 382 (1st Cir.1985) (29 days); *Misty Mgmt. Corp. v. Lockwood*, 539 F.2d 1205, 1213 (9th Cir.1976) (six months); *Snider v. England*, 374 F.2d 717, 719 (9th Cir.1967) (two months); *Berger*, 2007 WL 2462646 at *7 (17 days); *Hopkins v. D.L. Evans Bank (In re Fox Bean Co.)*, 287 B.R. 270, 282 (Bankr.D.Idaho 2002) (three months), *aff'd*, 144 Fed.Appx. 697 (9th Cir. 2005); *Shubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 348 B.R. 234, 276 (Bankr.D.Del.2005) (24 days), *aff'd*, 2007 WL 1232185 (D.Del. Apr.26, 2007); *Gabor*, 280 B.R. at 160 (six months); *Mon-*

us v. Antonucci (In re Monus), 1995 WL 469694 at \*12 (Bankr.N.D.Ohio 1995) (22 days); Ohio Corrugating Co. v. DPAC, Inc. (In re Ohio Corrugating Co.), 91 B.R. 430, 437 (Bankr.N.D.Ohio 1988) (16 days). "The period of time over which retrojection has been approved ranges from a few weeks to several months." Bartl v. Twardy (In re Claxton), 32 B.R. 224, 232 (Bankr.E.D.Va.1983).

 Retrojection, however, is not appropriate here given the nearly two-year gap between the Transfer and the Petition Date. "Insolvency determined as of one date may form the basis for the inference that insolvency existed on another date if the dates are relatively close in time and if no significant transactions occurred between the two dates." Gold v. Laines (In re Laines), 352 B.R. 397, 402 n. 6 (Bankr. E.D.Va.2005) (holding that January 4, 2004 schedules and statement of financial affairs could not be used to infer insolvency as of date of transfers that occurred on March 22, 2001, March 26, 2001 and December 26, 2002); see also Jackson, 318 B.R. at 16–17 (2 1/2–year gap was too long); Nicholls v. Jones (In re Jones), 2004 WL 826031 at \*4 (Bankr.D.Colo. Feb.5, 2004) (five-month gap was too long); Washington Bancorporation v. Hodges (In re Washington Bancorporation), 180 B.R. 330, 334 (Bankr. D.C.1995) (six-month gap was too long); War Eagle Floats, Inc. v. Travis (In re War Eagle Floats, Inc.), 104 B.R. 398, 400 (Bankr.E.D.Okla.1989) (six-month gap was too long).

The Trustee also has failed to carry her burden of proving that the Debtor was not generally paying her debts as they became due after the Transfer. The evidence did show that the Debtor was not paying her debts to her health care providers and had not paid a debt to JCPenney at that time. The evidence, however, also showed that the Debtor generally was paying her credit card debt and car payment, which was her largest monthly obligation. On balance, therefore, the Court does not find that the Debtor generally was not paying her debts as they became due. "Evidence that a debtor failed to pay some debts is not sufficient to prove that he is generally not paying his debts and, thus, will not give rise to a presumption that the debtor was insolvent at or near the time of the alleged fraudulent transfer." Krol v. Unglaub (In re Unglaub), 332 B.R. 303, 318 (Bankr.N.D.Ill.2005).

## VI. Conclusion

For the foregoing reasons, the Court finds that the Trustee is not entitled to judgment. The Court's decision renders Robert's cross-claim moot. The Court will enter a separate judgment in accordance with this memorandum opinion.

**IT IS SO ORDERED.**