**In re Devon Loraine GROVE–MERRITT aka, Devon L. Dullaghan, Debtor.**

**Ruth A. Slone, Trustee, Plaintiff**

**v.**

**Harvey Christophe Lassiter, Defendant.**

**Bankruptcy No. 07–31887.
Adversary No. 08–3068.**

United States Bankruptcy Court,
S.D. Ohio,
Western Division, at Dayton.

June 2, 2009.

784

Harvey Christophe Lassiter, Cincinnati, OH, Plaintiff pro se.

Stephen D. Brandt, Dayton, OH, to the Chapter 7 Trustee.

Ruth A. Slone, Dayton, OH, Chapter 7 Trustee.

Devon L. Dullaghan, Mason, OH, Debtor pro se.

**Decision On Trustee's Fraudulent Conveyance Complaint Pursuing Claims Under 11 U.S.C. § 548(a)(1) and Ohio Revised Code § 1336.04(A)(1) and (A)(2) Following Trial**

GUY R. HUMPHREY, Bankruptcy Judge.

## I. Introduction

This adversary proceeding is before the court following the trial of the Chapter 7 trustee's complaint to avoid and recover, as fraudulent conveyances under Ohio's version of the Uniform Fraudulent Transfer Act and the Bankruptcy Code, two transfers of the debtor's interests in real property made through quitclaim deeds from the debtor to the defendant. In her complaint, the trustee alleges that the transfers of the debtor's interests in the property to the defendant were made with the actual intent to hinder, delay, or defraud the debtor's creditors and, in addition, were not made in exchange for reasonably equivalent value. The matter was tried on January 13 and 15, 2009.

The court has carefully considered and weighed the testimony of the witnesses and the exhibits admitted into evidence, giving due consideration to the credibility and weight of each of those items. For the reasons set forth below, the court determines that the trustee cannot avoid the first transfer made in April 2005, but that the transfer made in December 2005 is avoidable as a fraudulent conveyance under both state and bankruptcy law. In lieu of avoiding the second transfer, the court is rendering judgment in favor of the trustee in the amount of $11,070.09 pursuant to Bankruptcy Code § 550(a) and Ohio Revised Code § 1336.07.

The following decision constitutes the court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## II. Facts and Procedural Background

### A. Findings of Fact

This adversary proceeding is the second adversary proceeding brought in the estate case of Devon Loraine Grove–Merritt, aka Devon Dullaghan (the "Debtor") (Case No. 07–31887). Harvey Christophe Lassiter,

aka Christo Lassiter, the defendant in this proceeding (the "Defendant" or "Mr. Lassiter") was the plaintiff in the first adversary proceeding which sought to deny dischargeability of a debt allegedly owed to him by the Debtor pursuant to § 523(a)(6) (Adv. Case No. 07–3215) (the "Dischargeability Proceeding"). In the Dischargeability Proceeding, Mr. Lassiter alleged that, prior to vacating the real property he owns at 5131 Carter Court, Mason, Ohio (the "Property"), the Debtor willfully and maliciously injured him by damaging the Property. The Property that Mr. Lassiter alleged in the Dischargeability Proceeding was willfully and maliciously damaged by the Debtor is the Property transferred to him by the Debtor through the quitclaim deeds that are the subject of the Trustee's Complaint and this proceeding.[1]

At all relevant times, the Defendant has been a professor at the University Of Cincinnati College Of Law ("UC Law School"). The Debtor was a former student of the Defendant who graduated from UC Law School in 2002 and was admitted to the Ohio bar that same year. The Debtor and her then husband, Joseph Moser, purchased the Property for $139,000 in June of 2003. To finance the purchase of the Property, the Debtor and Mr. Moser executed a note (the "Wells Fargo Note") and granted a mortgage (the "Wells Fargo Mortgage") in favor of Wells Fargo Home Mortgage ("Wells Fargo"). The Debtor, Mr. Moser, their two children and two cats resided at the Property until the Debtor and Mr. Moser separated in early February 2004. The Defendant has never resided at the Property. Following the separation from Mr. Moser, the Debtor experienced financial difficulties, which worsened over time and were still continuing at the time of the trial. See Trial Tr., p. 89. In the course of 2004, Wells Fargo threatened the Debtor with foreclosure. See Trial Tr., p. 3 and Pl. Exhs. 13 and 16.

On June 14, 2004, the Debtor filed a complaint with the Warren County, Ohio, Common Pleas Court, Domestic Relations Division (the "Divorce Court"), seeking a divorce from Mr. Moser. The Defendant assisted the Debtor in the pursuit of her divorce. See Pl. Exhs. 11 and 12. The Divorce Court entered a divorce decree on May 27, 2005 (the "Divorce Decree"), which awarded the Property to the Debtor and gave her until August 17, 2005 to refinance the Property and remove Mr. Moser from any liability that he may have had under the Wells Fargo Note and the Wells Fargo Mortgage. Def. Exh. 5. The Divorce Decree also provided that the Property was to be sold and the net proceeds or deficiency divided equally between the Debtor and her former husband in the event that the Debtor was unable to refinance it. Additionally, the parties stipulated in the Divorce Decree that they lacked equity in the Property. Id. See also Trial Tr., p. 141. Emails exchanged between the Debtor and the Defendant as well as the Debtor's trial testimony indicate that the Defendant played a significant role in ensuring that the Divorce Decree reflected a lack of equity in the Property. See Trial Tr., pp. 56–58 and Pl. Exhs. 12 (p. 2 of attachment, ¶ 3) and 22 and Def. Exh. 19. On cross-examination

---

1. The Dischargeability Proceeding was tried before this court on October 21, and 24, 2008. Mr. Lassiter, as the plaintiff in that adversary proceeding, was represented by counsel. The Debtor, as the defendant in that adversary proceeding, represented herself. Counsel for Ruth Slone, the trustee of the Debtor's estate (the "Plaintiff" or the "Trustee") attended the trial. In its decision filed March 31, 2009, the court found that any debt that may be owed by the Debtor to Mr. Lassiter was dischargeable. See Adv. Proc. No. 07–3215 (Doc. 63).

by the Defendant, the Debtor testified as follows on this point:

Defendant: Well, when you and your ex-husband, Mr. Moser, agreed there was zero equity in the house, did you just do that without any consultation with your real estate agent, Mr. Stadler, did he do that without any consultation with a real estate agent himself?

Debtor: Of course I didn't consult with a real estate agent, I was consulting with you, that was your decision.

Trial Tr., p. 143.

Mr. Moser conveyed title to the Property to the Debtor through a quitclaim deed dated October 13, 2004 (the "First Deed"). Pl. Exh. 5. On April 8, 2005 the Debtor executed a quitclaim deed transferring an undivided one-half interest in the Property to Mr. Lassiter (the "Second Deed"). Pl. Exh. 6. This First Deed and Second Deed were recorded in the Warren County, Ohio, Recorder's Office (the "Recorder's Office") on April 13, 2005. The transfer of the Debtor's undivided one-half interest in the Property to Mr. Lassiter on April 13, 2005 will be referred to as the "April Transfer."

The Debtor attempted to refinance the Property jointly with the Defendant but their joint credit application was denied. Because the Debtor was unable to refinance the Property alone or jointly with the Defendant, the Defendant, alone, applied for a loan with USAA Federal Saving Bank (the "Bank"). Trial Tr., pp. 89, 141 and Def. Exh. 1.5. On June 16, 2005 the Defendant entered into a loan agreement with the Bank evidenced by a note from the Defendant to the Bank in the amount of $140,000 (the "Note"). The Note was secured by a mortgage on the Property granted by both the Debtor and Mr. Lassiter also dated June 16, 2005 (the "Mortgage"). Pl. Exh. 9. The settlement statement dated June 16, 2005 indicates the payoff amount to Wells Fargo was $135,859.81. Pl. Exh. 8. The loan application signed by the Defendant on June 16, 2005 represented the value of the Property as $160,000. Pl. Exh. 1.2. A "closing fax" sent by the Bank's closing coordinator to the closing agent directs the latter to ensure that the mortgage is signed in the following manner: "Devon Loraine Moser, married Harvey Christophe Lassiter, single." (sic). Pl. Exh. 10. The Defendant receives quarterly bank statements evidencing his mortgage payments. See Def. Exh. 13, p. 13.

The appraisal (the "Appraisal") commissioned by the Bank in connection with the refinancing was conducted on May 5, 2005 by Barry K. Teegarden, a professional real estate appraiser. It lists the Property's value at $158,000. Pl. Exh. 4. Mr. Teegarden testified as an expert witness that the Appraisal was based on the Property being exposed to market conditions for a thirty to ninety day period. He also testified that the market conditions in the Mason area had not changed between May and December 2005. See Trial Tr., pp. 25, 30, 34, 42, 43. The court found Mr. Teegarden's testimony credible.

At the time he entered into the loan agreement, the Defendant fully expected that the Debtor would reimburse him for each monthly mortgage payment. As he explained—he was only supposed to be a conduit—he took the loan in his own name to assist the Debtor, he would make the mortgage payments, and then the Debtor was to pay him. See Trial Tr., pp. 224, 227 and Pl. Exh. 2. The Debtor, however, testified that she was to pay the Defendant back when she had the financial ability. See Trial Tr., pp. 100, 150–51, 163, 166.

No written agreement was ever executed between the Debtor and the Defendant to detail the terms of their understanding or the Debtor's occupancy of the Property. *See* Trial Tr., p. 151. Mr. Lassiter timely made all mortgage payments. The Debtor was only able to make one full payment. *See* Trial Tr. pp. 274–75.

On December 29, 2005 the Debtor recorded a quitclaim deed transferring her remaining undivided one-half interest in the Property to the Defendant in the Recorder's Office (the "Third Deed"). Pl.Ex. 7. This transfer will be referred to as the "December Transfer" and the April Transfer and the December Transfer will be collectively referred to as the "Transfers."

The Third Deed contains the purported signatures of the Debtor, as grantor, and the Defendant, as grantee. Neither the Debtor nor the Defendant signed the Third Deed in front of a notary. *See* Trial Tr., pp. 97, 101 and Def. Exh. 16, p. 9. The Defendant testified that he did not learn about the Third Deed until Ella Walters, a property manager and real estate agent who became his property manager for the Property, informed him on March 19, 2007. *See* Trial Tr., p. 207. On December 26, 2006, the Defendant filed a police report with the Mason, Ohio Police Department, after he received an anonymous voice mail message stating that the Debtor had given birth to their daughter and that the Property was going to be "trashed". Pl. Exh 1.4; Def. Exh 10. That police report lists the Defendant as the owner of the Property and the Debtor as the person residing there. *Id.*

Mr. Lassiter testified that the Third Deed came about because, after an audit, the Bank determined that he owned only a one-half interest in the Property and required the remaining interest to be transferred to him otherwise the Bank would call the loan. *See* Trial Tr., p. 233. How-

ever, the Defendant did not introduce any documentary evidence reflecting the Bank's demand or any such position asserted by the Bank. In his responses to the Trustee's interrogatories and in a written statement dated August 2, 2007 that he prepared for the Trustee titled "Statement from Mr. Lassiter regarding his understanding as to how, when and why the Carter Court real estate was transferred to him, and the consideration, if any, that he gave for such transfer," the Defendant failed to raise any issue as to the validity of the Third Deed. Pl. Exh. 1. After the Trustee filed this proceeding against him, the Defendant, in August 2008, filed a report with the Mason Police claiming to have been harmed by a forgery. Trial Tr., p. 101. When asked by the Trustee why, upon allegedly learning of the existence of the Third Deed, he did not express any concern about the forgery, the Defendant explained that, after talking to numerous bankruptcy attorneys and a contract attorney who advised him that the disclosure of the forged deed would tie up the property for a long time during which he would still have to make the loan payments, he "made a calculation that at that point [he] could ratify this transfer. It was an economic decision." Trial Tr., p. 208.

The Debtor vacated the Property in late December 2006. On March 19, 2007, Mr. Lassiter visited the Property with Ms. Walters. They found the Property in disrepair. The Defendant introduced evidence that he expended $15,426.16 to place the Property in a marketable condition. *See* Def. Exh. 13 and Def. Answer and Counterclaim (Doc. 7).

## B. Procedural Background

On May 3, 2007 the Debtor, *pro se,* filed a petition for relief under Chapter 7 of the Code. Mr. Lassiter has not filed a proof of claim in the Debtor's estate case. Howev-

er, as previously mentioned, he filed the Dischargeability Proceeding against the Debtor seeking a declaration that the $15,426.16 in damages he has claimed he incurred to render the Property marketable constitute a nondischargeable debt owed to him.

The Trustee commenced this adversary proceeding by filing and serving the Complaint on Mr. Lassiter on March 6, 2008.[2] Mr. Lassiter filed an *Answer* and *Counterclaim* denying that any fraudulent transfer was made to him because the Debtor lacked equity in the Property and asserting an affirmative defense that the Transfers were made for reasonably equivalent value because the Debtor owed him the following prepetition obligations: a) $15,426.16 for the expenditures he made to render the Property marketable after the Debtor vacated the Property and b) "in excess of $14,000" for "unpaid value for the Debtor's occupancy of the Plaintiffs property over a 17 month period." Doc. 7, p. 1. Mr. Lassiter also asserted a right of setoff and a counterclaim for $14,078.55 representing 17 months of mortgage payments not paid by the Debtor, as well as a claim for $15,426.16 in damages based on the

expenditures he made to render the Property marketable.

On November 5, 2008, the Trustee filed a *Plaintiff's Motion for Partial Summary Judgment* as to the Defendant's set-off defense and counterclaims (Doc. 22) and on November 06, 2008, Mr. Lassiter filed a *Motion to Dismiss Proceeding and or Dismiss Causes of Action* (Doc. 23) (the "Motion to Dismiss"). On January 6, 2009, the court rendered an oral decision by telephone and entered an accompanying order granting the Trustee's Motion for Partial Summary Judgment and denying the Defendant's Motion to Dismiss.[3]

On January 12, 2009, one day before the scheduled trial date, counsel for the Defendant filed a motion to withdraw as counsel. Docs. 42 and 46. With the Defendant's consent and request to proceed *pro se*, the court heard and granted the motion on January 13, 2009, immediately before the trial of this adversary proceeding began.

The witnesses at the trial were Mr. Lassiter, the Debtor, and the appraiser, Mr. Teegarden. The court admitted Plaintiff's Exhibits 1–3, 6–8, and 21 without objec-

---

**2.** In addition to the Trustee's Complaint filed on March 6, 2008 (the "Complaint") (Doc. 1), the pleadings and filings in this proceeding include the Defendant's Answer and Counterclaim (the "Answer and Counterclaim") (Doc. 7); the Plaintiff's Reply to Counterclaim (Doc. 8); the Defendant's Exhibit and Witness List (Doc. 28); the Plaintiff's Trial Brief (Doc. 29); the Trustee's Witness List (Doc. 30); the Trustee's Exhibit List (Doc. 31); and the parties' post-trial briefs filed on February 2, 2009 (Doc. 55) and (Doc. 56).

**3.** The Trustee sought summary judgment on the Defendant's counterclaim seeking to setoff amounts that the Defendant alleged the Debtor owed to him and on the Defendant's *in pari delicto* defense. The court granted the Trustee's motion through the oral decision announced on January 6, 2009. In addition, through that oral decision, the court denied the Defendant's Motion to Dismiss, which the

court construed in part as a motion for judgment on the pleadings and in part as a motion for summary judgment, which sought dismissal of the Trustee's claims on the following arguments: a) the doctrine of *in pari delicto* barred the Trustee's claims; b) any federal fraudulent conveyance claims should have been dismissed on account of the Trustee's failure to plead any such claims in her Complaint—arguing that the Trustee only cited § 544 in her Complaint permitting the Trustee to only pursue claims under applicable state law; and c) the two-year period provided in § 548 for pursuit of avoidable transfer claims barred the Trustee's claims under § 548 as to the April Transfer. However, the court reserved for the trial determination of the last issue as to whether the Trustee's claim under § 548 relating to the April Transfer was time-barred. *See* Doc. 41.

tion. Plaintiff's Exhibits 4, 10–19, and 22 were admitted over the objection of the Defendant. The Plaintiff withdrew Exhibit 20. All of the Defendant's Exhibits, 1–24, were admitted without objection.

## III. Analysis

### A. Jurisdiction

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334, and the standing General Order of Reference in this District. This is a core proceeding by virtue of 28 U.S.C. § 157(b)(2)(H).

### B. Standards and Burdens Under Fraudulent Conveyance Claims

■ The Trustee asserts that the Transfers of the Property by the Debtor to the Defendant are subject to avoidance as both actual fraudulent transfers, i.e. made with the actual intent to hinder, delay, or defraud creditors (the "actual fraudulent transfer claims"), and constructively fraudulent, i.e. for less than reasonably equivalent value (the "constructive fraudulent transfer claims"). She brings those claims under Bankruptcy Code § 544(a)(3) [4] permitting a bankruptcy trustee to seek avoidance of fraudulent transfers under applicable state laws, including the Ohio Uniform Fraudulent Transfer Act, Ohio Revised Code ("ORC") § 1336.01 et seq. (the "Ohio UFTA") and § 548(a)(1). The Trustee has the burden of proof as to all the required elements of these claims. *Baumgart v. Bedlyn, Inc. (In re Empire Interiors, Inc.)*, 248 B.R. 305, 307 (Bankr. N.D.Ohio 2000) and *Fox v. KeyBank National Ass'n (In re Fox)*, 265 B.R. 739, 744 (Bankr.N.D.Ohio 2001) (citing *Crews v. Shopping Center Equities, Inc. (In re*

*Sneakers Sports Grill, Inc.)*, 228 B.R. 795, 800 (Bankr.M.D.Fla.1999)).

The fraudulent transfer provisions of the Code and the Ohio UFTA are substantially similar both in terms of rights, remedies, and defenses. *See Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 483 n. 3 (D.Conn.2002) and *Bash v. Cunningham (In re Cunningham)*, 2008 WL 2746023 (Bankr.N.D.Ohio July 11, 2008). Therefore, findings made under the Code are applicable to actions under the Ohio UFTA. *Levit v. Spatz (In re Spatz)*, 222 B.R. 157, 164 (N.D.Ill.1998). The main distinction between those two statutes, one with some import in this proceeding, is the reach-back period. The Code permits the avoidance of fraudulent transfers made within two years of the petition date whereas the Ohio UFTA permits avoidance of those transfers for up to four years after the date such transfers occurred. 11 U.S.C. § 548(a)(1) and ORC § 1336.09(A) and (B).

### C. The Trustee's Claim Under Code § 548(a)(1) Pertaining to the April Transfer Is Time–Barred

■ The April Transfer occurred outside the permissible two year reach-back period for fraudulent transfer claims provided by § 548(a)(1). For purposes of fraudulent transfer claims under § 548, the date the conveyance of the Property was recorded, thus perfected under Ohio law, constitutes the date of the transfer. *In re Bethel, Inc.*, 79 B.R. 717, 721 (Bankr. S.D.Ohio 1987). The April Transfer occurred on April 13, 2005, the date the Second Deed was recorded, and, therefore, since her petition was filed on May 3, 2007, falls outside the applicable reach-back period under the Code. Accordingly, the

4. Unless otherwise noted, all statutory references are to the Bankruptcy Code of 1978, as amended, 11 U.S.C. §§ 101–1532 (the "Code"), cited hereinafter in this decision as "§ ___".

Trustee's claim under § 548(a)(1) relating to the April Transfer is time barred and will be dismissed.

Nevertheless, the Trustee may still pursue her avoidance claims relating to the April Transfer under the Ohio UFTA since that transfer falls well within the applicable four-year reach-back period provided by the Ohio UFTA. *See Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 634 n. 15 (Bankr.S.D.Ohio 2006) (noting that the primary difference between an avoidance action under § 548 and one under § 544 and the Ohio UFTA is that the Ohio UFTA provides that fraudulent transfers may be avoided up to four years after the date of the transfer). Practically speaking, the distinction in the reach back period between the Code and the Ohio UFTA impacts the Trustee's claim only with respect to the level of proof she is required to meet on her actual fraudulent transfer claim, which, as will be discussed further in this decision, is higher under the Ohio UFTA than the Code.

### D. Determination of the Value of the Property and the Debtor's Equity in the Property

Because the value of the Property as of the time of the Transfers is relevant to both the Trustee's actual fraudulent transfer claims and her constructive fraudulent transfer claims, the court will address that issue and the related issue of the value of the Debtor's equity in the Property at the time of the Transfers first. Those values were the subject of much controversy at the trial.

The value of the Property set forth in the Appraisal constitutes an appropriate reference to determine the value of the consideration received by the Debtor at the time of both of the Transfers and conversely, that of the benefit conferred by the Debtor upon the Defendant. At the

Bank's request, Mr. Teegarden appraised the Property on May 5, 2005 at $158,000. *See* Trial Tr., pp. 26, 33 and Pl. Exh. 4. Further, while Mr. Teegarden explained that his appraisals may generally be relied upon for a six month period following their preparation, he declared that he had no reason to believe that the market conditions changed from May to December 2005 and, therefore, opined that the Property would not have been worth less in December 2005. *See* Trial Tr. pp. 30, 42–43. He also credibly testified that the housing market in the Mason area remained strong throughout 2005. *Id.* Accordingly, the court **FINDS** that the value of the Property both at the time of the April Transfer and at the time of the December Transfer was $158,000.

The $158,000 value is also supported by the Defendant's loan application for the loan provided by the Bank, which represented the value of the Property to be $160,000. Pl. Exhs. 1–2; Def. Exh. 3. The Defendant tried to distance himself from some of the information contained in the loan application by asserting that someone else provided that information to the Bank. Yet, on June 16, 2005, the date of the closing of the refinancing, he signed the loan application after correcting certain information he found to be inaccurate. *See* Trial Tr., pp. 199–202. He did not change the $160,000 value attributed to the Property. *Id.* In signing the loan application, he certified to the Bank, its successors, assigns and agents, that the information that he, as a borrower, provided was correct as of the date he signed it. The court considers this certification as an acknowledgement of the value of the Property by the Defendant.

The Defendant also challenged the value computed by Mr. Teegarden on the bases that: a) Mr. Moser and Ms. Dullaghan stipulated to the lack of equity in the

Property at the time of their divorce and, therefore, the court should find that there was no equity in the Property at the time of the Transfers; b) comparables found by the Defendant online through the internet established a lower value; and c) the value computed by Mr. Teegarden should be discounted for hypothetical sale costs and because of the "distressed" conditions under which the Transfers were made. The court does not find any of those arguments persuasive.

■ First, the Defendant argued that the Debtor's and Mr. Moser's stipulation of "zero equity" in the Property in the Divorce Decree indicates that the Debtor did not transfer anything of value to him. This argument ignores the well-established principle that a bankruptcy trustee is not bound by the manner in which a divorce court allocates property pursuant to a divorce decree. *Corzin v. Fordu (In re Fordu)*, 201 F.3d 693, 702 (6th Cir.1999). In *Fordu*, the Sixth Circuit noted that the issue for a divorce court allocating marital property is whether a property settlement is a fair and just settlement under applicable state law whereas the issue before a bankruptcy court evaluating a fraudulent transfer claim is whether the debtor received reasonably equivalent value under the Code or applicable state fraudulent conveyance law. *Id.* at 707–08. Accordingly, the stipulation of no equity sanctioned by the divorce court in the Divorce Decree is not relevant for purposes of determining the value of the Debtor's interest in the Property and the Defendant's argument fails.

Second, the record is devoid of evidence establishing any arms length negotiations between the Debtor and Mr. Moser in connection with the disposition of the Property. The only negotiations between the Debtor and Mr. Moser concerning the disposition of the Property focused on persuading Mr. Moser to stipulate that there was no equity in the Property, or if there were any, he would relinquish his share. *See* Pl. Exh. 12. The Defendant played a significant part in these negotiations as he drafted a proposed settlement agreement setting forth the terms of the divorce, including the disposition of the Property. Thus, it appears that Mr. Moser's stipulation to no equity was based on nothing more than the persuasive power of the Debtor and potentially that of the Defendant[5]. All these efforts were aimed at ensuring that the Debtor would remain on the Property and at minimizing the cost of the refinancing to be undertaken by the Defendant. Mr. Moser never had a choice between relinquishing his interest in the Property or subjecting the Property to a sale with a split of the net profits. *See Slone v. Dirks (In re Dirks)*, 2009 WL 103606 (6th Cir. BAP Jan. 16, 2009) (table decision)(deduction of hypothetical real estate commission or sale cost appropriate when the debtor chose to accept a lump sum payment for her share of equity in the marital property rather than subject it to sale with a split of net proceeds). The fact that the parties never considered the sale of the Property and the absence of arms length negotiations between them render the argument as to "zero equity" in the Property unpersuasive in determining the Property's value.

Third, the Defendant's internet sale comparables generally lacked probative value and support rather than contradict

---

**5.** While evidence introduced by the Defendant reflects that the magistrate in the divorce proceedings ordered that an appraisal be performed prior to the entry of the Divorce Decree, the Debtor testified that she could not recall if such an appraisal was in fact performed (Trial Tr. pp. 290–94) and no evidence of such an appraisal was ever produced.

Mr. Teegarden's value.[6] The 5116 Carter Court property sale included on Defendant's Exhibit 7 is smaller in size than the Property (1,364 square feet compared to 1,508 square feet) and sold for $150,000 in June 2005. On a square foot basis, the Property at issue in this proceeding sold for $104.77 a square foot and this comparable sold for $110.78 a square foot. That higher square footage sale price applied to this Property would result in an estimated value of $167,000. The 5100 Carter Court property also sold in June 2005 and Defendant's Exhibit 7 reflects that this property has 1852 square feet and sold for $182,000, resulting in a price of $98.27 a square foot. The average of the $98.27 and $110.78 square footage prices for these two comparables on Defendant's Exhibit 7 is $104.53, just slightly under Mr. Teegarden's square footage value for the Property (which would equate to a value of $157,631 for the Property). These numbers support Mr. Teegarden's value.

■ Fourth, the Defendant argued at length that the value of Property in the Appraisal had to be adjusted down to reflect both the hypothetical real estate commission that the Debtor would have incurred had she sold the Property and the "distressed sale" conditions resulting from the imposition of the August 17, 2005 deadline before which, under the Divorce Decree, the Debtor had to sell the Property. The Defendant's reasoning is flawed for several reasons. The court appreciates the appropriateness, in some circumstances, of deducting a hypothetical real estate commission from the value of a marital property allocated to one party pursuant to a divorce decree. However, these

circumstances simply do not apply in this instance because at no point before, during or after the divorce proceedings were concluded, did the Debtor, her ex-husband or the Defendant contemplate the sale of the Property. Further, assuming *arguendo*, that the former spouses did contemplate the sale of the Property, Mr. Teegarden testified that the Appraisal was based on an exposure to market conditions for a thirty to ninety day period. Trial Tr. p. 34. This timeframe is consistent with the almost three month window the Debtor had to sell or refinance the Property under the Divorce Decree and forecloses the imposition of a distressed sale value. The magistrate entered his decision on May 27, 2005 and the Debtor had until August 17, 2005 to sell or refinance the Property. However, instead of exposing it to that market, the Debtor refinanced the Property through the Defendant with the Defendant assuming title to the Property without the benefit of exposure to the market.

Last, as previously discussed, the evidence indicates that the Defendant injected himself into the process of Mr. Moser's and the Debtor's disposition of the Property (including sending a letter to Mr. Moser requesting that Mr. Moser "quit claim [his] interest to Devon without compensation...." Pl. Exh. 22), with the result of becoming the owner of the Property. It would not be proper to allow a party in such a situation to wrest control of a property from a debtor without exposing the property to the market and then give that person the benefit of the doubt with a distressed sale price or deduction of hypothetical sale costs.

**6.** Even though the Trustee did not object to the admission of Defendant's Exhibit 7, the court cannot accord much probative value to that exhibit because it is hearsay and the Defendant did not offer any testimony or evidence as to how it was prepared and particularly as to the methodology and data used to generate the information contained in this exhibit.

Accordingly, under the circumstances of this case, the court **FINDS** that deducting a hypothetical real estate commission and applying a distressed sale value is inappropriate and would penalize the Debtor's creditors to the Defendant's benefit, irrespective of whether the Defendant entered into the Transfers with intent to take advantage of the Debtor and her creditors.

In sum, based on Mr. Teegarden's Appraisal and testimony and the other evidence introduced by the parties, the court **FINDS** that, at the time of both Transfers, the Property's value was $158,000. The court further finds that at the time of the April Transfer, the Debtor's equity amounted to $22,140.18, the Debtor transferred $11,070.09 of that equity to the Defendant at the time of the April Transfer, and the remaining $11,070.09 to the Defendant at the time of the December Transfer.

### E. The Actual Fraudulent Transfer Claims: Whether The Transfers Were Made by the Debtor with an Actual Intent To Hinder, Delay, or Defraud Creditors

The Trustee asserts that the Transfers constitute fraudulent transfers pursuant to § 548(A)(1)(A) [7] and ORC § 1336.04(A)(1) [8], the actual fraudulent transfer provisions of the Ohio UFTA and the Code.

■■ To set aside the Transfers of the Debtor's interests in the Property as actual fraudulent transfers, the Trustee must show that the Transfers were made with the "actual intent to hinder, delay or defraud" the Debtor's creditors. 11 U.S.C. § 548(a)(1)(A); ORC § 1336.04(A)(1). Under the UFTA, intent must be established by clear and convincing evidence. *Daneman v. Stanley (In re Stanley)*, 384 B.R. 788, 799 (Bankr.S.D.Ohio 2008) (internal citations omitted). Under the Code, however, the standard of proof a Trustee must meet to avoid a fraudulent transfer based on § 548(a)(1)(A) is the lower preponderance of the evidence standard.[9] Thus, in order to succeed on her claims, the Trustee must meet a clear and convincing evidence standard to avoid the April Transfer under the Ohio UFTA, but may prevail on her § 548(a)(1) claims under the lower federal evidentiary standard with respect to the December Transfer.

■■ "Because proof of actual intent to hinder, delay or defraud creditors may rarely be established by direct evidence, courts infer fraudulent intent from the cir-

7. § 548(a)(1) in pertinent part provides:

> The Trustee may avoid any transfer ... of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years before the date of filing of the petition, if the debtor voluntarily or involuntarily—
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or obligation was uncured, indebted[.]

8. ORC § 1336.04 provides in pertinent part as follows:

> (A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

9. Even though courts are split as to the standard of proof a trustee must meet in an action under § 548(a)(1)(A), a majority follows the preponderance of the evidence standard and rely on the Supreme Court decision of *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) that established that the preponderance of the evidence standard was applicable to dischargeability actions under the Code, including actions based on fraud. *Id.* at 288–89, 111 S.Ct. 654.

cumstances surrounding the transfer." *Schilling v. Heavrin (In re Triple S. Rests., Inc.)*, 422 F.3d 405, 416 (6th Cir. 2005). Such circumstances are reflected in the factors that are often referred to as the "badges of fraud", which under Ohio law include:

(1) Whether the transfer or obligation was to an insider;

(2) Whether the debtor retained possession or control of the property transferred after the transfer;

(3) Whether the transfer or obligation was disclosed or concealed;

(4) Whether before the transfer was made or the obligation incurred, the debtor had been sued or threatened with suit;

(5) Whether the transfer was of substantially all of the assets of the debtor;

(6) Whether the debtor absconded;

(7) Whether the debtor removed or concealed assets;

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the obligation incurred;

(9) Whether the debtor was solvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

ORC § 1336.04(B). Once a plaintiff establishes a sufficient number of badges of fraud, the burden shifts to the defendant to demonstrate that the debtor received a benefit or that there was some legitimate purpose for the transfer. *Silagy v. Gagnon (In re Gabor)*, 280 B.R. 149, 157 (Bankr.N.D.Ohio 2002). "Although the presence of a single badge [of fraud] may only raise the suspicion of a debtor's fraudulent intent, the confluence of several badges can be conclusive evidence of fraudulent intent, absent significantly clear evidence of the debtor's legitimate supervening purpose." *Id.*

The Trustee argued at trial the existence of the following badges of fraud at the time of the Transfers: a) transfer to an insider of the Debtor; b) the Debtor remained in possession of the Property after the Transfers were made; c) the Debtor had been threatened with foreclosure; and d) the Transfers were of substantially all of the assets of the Debtor. *See* Trial Tr., p. 300. In addition, evidence was introduced at the trial as to the Debtor's solvency at the time of the Transfers or shortly thereafter.

The court will analyze the badges of fraud and other elements of the Trustee's actual fraudulent transfer claims for the two Transfers separately because the factual circumstances were different for each transfer, particularly given the eight and one-half months that separated both Transfers.

### 1. The April Transfer

Since no direct evidence was introduced to establish that the April Transfer was made with the deliberate intent to hinder, delay, or defraud the Debtor's creditors, the court directly turns to the "badges of fraud" alleged by the Trustee to exist under the Ohio UFTA.

i. Insider Status: Although the Ohio UFTA and the Code contain the iden-

tical definition of "insider",[10] the determination of whether a "significant other" or "cohabitating partner" can constitute an "insider" varies between the Ohio courts under the UFTA and the bankruptcy courts under the Code.[11] While recognizing that the word "includes" does not limit the definition of "insider" to the statutory list, the only Ohio court decision of which this court is aware interpreting "insider" under the Ohio UFTA with respect to such a relationship held that an unmarried partner does not fall within the ambit of the definition of an insider. *Porter v. Saez*, 2004 WL 1103508, at *10 (Ohio Ct.App. May 4, 2004) (unreported) ("[W]e find the language of the statute as enacted by the General Assembly in 1990 provides reliable evidence of the General Assembly's intent not to include an unmarried cohabitating partner of an individual debtor as an 'insider' for purposes of ORC § 1336.01(G)(1)." (citing Sub. H.B. No. 506, 143 Ohio Laws, Part III, 5403)). Accordingly, in deference to the state courts' interpretation of Ohio statutes, this court **FINDS** that the Defendant was not an insider for purposes of the Ohio UFTA.

ii. Debtor's Retention of the Property: The Debtor's retention of the Property following the April Transfer also supports the Trustee's actual fraudulent transfer claim. The Debtor's retention of possession of the Property after the April Transfer is not disputed. In fact, uncontroverted evidence suggests that the April Transfer was made to facilitate the refinancing of the Property by the Defendant precisely to allow the Debtor and her children to remain in the Property. The Defendant lent his good credit to the Debtor so that she could stay in the Property. *See* Pl. Exhs. 1–3 and 22.

iii. Threat of Litigation: The Trustee also established that the Debtor had been threatened with suit, a third badge of fraud. The Debtor testified and the evidence suggests that before the April Transfer, the Debtor had been threatened with foreclosure. On August 4, 2004, the Defendant sent the Debtor an email relating a dream he had where he was in "Wells Fargo (*sic*), North Dakota and that [we] were visiting the bank that is threatening foreclosure". Pl. Exh. 13. The Defendant's testimony that this email had nothing to do with reality is self serving and lacks credibility in light of the nature of the relationship between the Debtor and the Defendant, the Defendant's extensive involvement in the Debtor's personal affairs, which was exposed in their email correspondence during their relationship, and the realities of the Debtor's circumstances at that time. Further, an email dated August 23, 2004, from the Debtor to a real estate agent where the Debtor notes "I am still here, still paying, no foreclosure" supports the Debtor's testimony that she was threatened with foreclosure as early as 2004. Pl. Exh. 16. *See also* Trial Tr. pp. 63–64, 69.

**10.** ORC § 1336.01(G)(1) and § 101(31) provide that: "Insider" includes all of the following:
(1) If the debtor is an individual, any of the following:
(a) A relative of the debtor or of a general partner of the debtor;
(b) A partnership in which the debtor is a general partner;
(c) A general partner in a partnership described in division (G)(1)(b) of this section;
(d) A corporation of which the debtor is a director, officer, or person in control.

**11.** The court will discuss the interpretation of "insider" under the Code in the section related to the December Transfer since contrary to the April Transfer, the December Transfer falls within the statute of limitations of the Code.

iv. Debtor's Insolvency: In addition to being under the threat of foreclosure prior to the April Transfer, the Debtor was insolvent at the time of the April Transfer. The Trustee met his burden of proving by a preponderance of the evidence that, at the time of the April Transfer, or immediately following that transfer, the Debtor was insolvent [12]. *See Stanley*, 384 B.R. at 805–06 (internal citations omitted). Under the Ohio UFTA, "[a] debtor is insolvent if the sum of the debts of the debtor is greater than all of the assets of the debtor at a fair valuation. A debtor who generally is not paying his debts as they become due is presumed to be insolvent." ORC § 1336.02(A)(1) and (2). Insolvency is essentially a balance-sheet test. *Foreman Indus., Inc. v. Broadway Sand & Gravel (In re Foreman Indus., Inc.)*, 59 B.R. 145, 149 (Bankr.S.D.Ohio 1986). The Debtor testified that, for the short amount of time during which she held full title to the Property prior to the April Transfer, her only true asset was the Property itself, her credit card debts were mounting, she was making payments of $300 each month for a vehicle that she later relinquished, and her assets did not exceed her liabilities. *See* Trial Tr., pp. 75–76. *See also* Trial Tr., pp. 142–43, 280. Upon cross-examination by the Defendant, she explicitly stated that in 2005, she was insolvent.

Defendant: Well, one of the badges of fraud, Ms. Dullaghan, is whether or not the debtor is made insolvent by the loss of an asset through a conveyance. Now, as I kind of understood where you were on direct you seemed to be having money problems at least as early as 2004.

Debtor: That's correct.

Defendant: But you were not insolvent, is that correct?

Debtor: I believe that I was insolvent at that time.

Defendant: I'm sorry?

Debtor: I believe I was probably even insolvent at that time.

Defendant: Okay, what do you mean by insolvent? Were you paying the bills?

Debtor: I was paying my bills but it was sort of a juggling act because I had excellent credit before so I would end up having to take out extra credit and transferring from one credit card to another, balances and stuff, try and make——to try and get by. I had a lot of difficulty. Yes, for a period of time, I was scrapping by, making just about all of my payments but I was having a lot of problem at that point in time.

Defendant: So you were paying your bills?

Debtor: I was not able to pay all of them. Certain things would go late and then I would catch it up the next month and then something else would go late.

Defendant: So give or take a month, you were paying the bills?

Debtor: I'm sorry, this was in 2004, right?

Defendant: No, talking 2005, at the time of the conveyance.

Debtor: Oh, in 2005, no I was definitely insolvent then.

---

12. The definition of "insolvent" under the Code is not relevant to the April Transfer because as explained before, this transfer was outside the reach-back period of the Code and is only reviewed under the Ohio UFTA.

Defendant: Explain that for me please.

Debtor: Because I wasn't able to make all my payments, I wasn't able to pay all my bills.

Defendant: What bills were you unable to pay?

Debtor: Certain credit card bills were lapsing. I wasn't able to pay the full amount of the mortgage.

Trial Tr., pp. 158–59. *See also* Trial Tr., p. 280. Although she indicated that she had some household goods of nominal value, she failed to identify any assets, other than the Property, in which she had any equity. Those same credit card debts were the subject of an email message from the Defendant to another lawyer dated July 28, 2006 in which Mr. Lassiter is inquiring as to the Debtor's options in dealing with approximately $30,000 in credit card debt, with approximately $15,000 of that being principal and approximately $15,000 being interest and fees. *See* Pl. Exh. 21. Accordingly, the court finds that the Debtor was insolvent at the time of the April Transfer.[13]

v. Reasonably Equivalent Value: The Trustee has conceded that the Defendant's relieving the Debtor of a $135,859.81 debt in exchange for the Debtor's transfer of her one-half interest in the Property constitutes value. *See* Trial Tr., pp. 77, 92, 300–01. Further, irrespective of the value placed on the Property at the time of the April Transfer, the value of the consideration received by the Debtor was more than reasonably equivalent in comparison to the value of the one-half interest in the Property transferred to the Defendant. Therefore, the court finds that reasonably equivalent value existed for the April Transfer.

To summarize, the Trustee has established three badges of fraud: (i) the Debtor retained possession of the Property; (ii) the Debtor was threatened with suit before the April Transfer; and (iii) the Debtor was insolvent. The court does not find that the April Transfer was substantially all of the Debtor's assets because the Debtor retained a one-half interest in the Property, albeit encumbered by the Mortgage given by the Debtor and the Defendant to the Bank to secure the Defendant's obligations under the Note. Further, the Debtor received ample consideration for the transfer in the form of being relieved of the Wells Fargo obligation. Because the Trustee has established the existence of several badges of fraud, the burden shifts to the Defendant to demonstrate that the Debtor received a benefit or that there was some legitimate purpose for the April Transfer. *Gabor*, 280 B.R. at 157.

The Defendant met his burden of establishing that the Debtor received a benefit or that there was some legitimate purpose for the April Transfer. As noted above, the Trustee, the Defendant and the Debtor all agree that the April Transfer was unquestionably effectuated to give the Defendant an interest in the Property sufficient to allow him to refinance the Property, which he did on June 16, 2005. *See* Trial Tr., pp. 74–75. By undertaking this refinancing, the Defendant relieved the Debtor from her obligation under the Wells Fargo Note for which the Debtor had become solely responsible as a result of her divorce settlement. *See* Trial Tr., pp. 77, 92, 300–01. In other words, the Debtor relinquished the $11,070.09 equity that she had in the one-half interest in the Property in exchange for being relieved from a

---

**13.** The court also views the fact that the Bank would not allow the Debtor to refinance the Property, even jointly with the Defendant, as strongly indicative of her insolvency. *See* Trial Tr., p. 74 and Def. Exhs. 14 and 19.

$135,859.81 debt. Moreover, the uncontroverted testimony shows that the April Transfer was effectuated for the purpose of enabling the Debtor to remain in the Property that she was not able to refinance. *See* Trial Tr. pp. 74–75, 138–39, 300. The Defendant has accordingly overcome the presumption of fraud that the badges of fraud raised.

Accordingly, the court **FINDS** that the April Transfer was not a fraudulent transfer under ORC § 1336.04(A)(1).

### 2. The December Transfer

 Having determined that the April Transfer was not fraudulent under ORC § 1336.04(A)(1), the court must now determine whether the December Transfer was a fraudulent transfer under either that provision or § 548(a)(1)(A). This transfer occurred on December 29, 2005, the date the Third Deed was recorded (*See In re Bethel, Inc.*, 79 B.R. at 721 and ORC § 5301.25(A)) and, accordingly, falls well within the statutory limitations period of both the Ohio UFTA and the Code.

While questions arose in both this proceeding and the Dischargeability Proceeding as to the validity and enforceability of the Third Deed [14], the Debtor undoubtedly transferred her remaining one-half interest in the Property to the Defendant on December 29, 2005 and the Defendant accepted and ratified that transfer.[15] Based

---

**14.** The Defendant disputed the authenticity of his signature on the Third Deed and that of the notary. Trial Tr., pp. 95–96, 102, 195–96, and 261–62. However, the transferee's signature is not necessary on a deed prepared under Ohio law. *See* ORC § 5301.01(A). Further, while the Debtor testified at her creditors' meeting that she never signed the Third Deed in front of a notary, it is clear that she signed it sometime prior to December 29, 2005 and then recorded it with the Recorder on December 29, 2005. Trial Tr., pp. 96–97; Def. Exh. 23. A defectively executed deed is still effective between the grantor and grantor. *See In re Downs*, 205 B.R. 93, 96 (Bank. N.D.Ohio 1996) (citing *Citizens Nat. Bank in Zanesville v. Denison*, 165 Ohio St. 89, 133 N.E.2d 329 (1956) and *Seabrooke v. Garcia*, 7 Ohio App.3d 167, 454 N.E.2d 961 (1982); *cf. Basil v. Vincello*, 50 Ohio St.3d 185, 553 N.E.2d 602 (1990)).

**15.** The Defendant never disclaimed owning a full interest in the Property after December 2005. For example, when he made his Incident Report to the Mason Police Department on December 13, 2006, he reported that he was the owner of the Property and that the Debtor merely resided there. *See* Pl. Exh. 1–4 and Def. Exh. 10. In an email to the Debtor dated March 26, 2007, the Defendant indicates that "the disposition of the house is not your concern. You and I are not on the deed having transferred it from you and me to me." Pl. Exh. 20. During the Debtor's creditors' meeting, both the Debtor and the Defen-

dant's counsel at the time acknowledged that the Defendant was the title holder of the Property. *See* Pl. Exh. 1.6, pp. 8–9. Moreover, the gist of the Dischargeability Proceeding was the Defendant's attempt to recover a nondischargeable debt from the Debtor for her damaging the Property for which he claimed to be the owner. Additionally, in his responses to the Trustee's interrogatories and in a statement dated August 2, 2007 that he prepared for the Trustee titled "Statement from Mr. Lassiter regarding his understanding as to how, when and why the Carter Court real estate was transferred to him, and the consideration, if any, that he gave for such transfer," the Defendant never raised any issue as to the validity and enforceability of the Third Deed. Further, contradicting his claim of having no knowledge of the transfer until March 2007 (*See* Trial Tr., p. 207), the Defendant testified in this proceeding that the December Transfer was made at the request of the Bank which, after an audit, had noticed that the Defendant and the Debtor held the Property jointly and called the Defendant to demand that the Debtor transfer her remaining one-half interest to him or the Bank would call the loan. Trial Tr., pp. 94–99. Further, during the trial of this proceeding the Defendant testified that after he consulted with several bankruptcy attorneys, he decided he "could" ratify that transfer by the Debtor to him. Trial Tr., pp. 207–208. Finally, in his August 25, 2007 memorandum to the Trustee's counsel, he stated that he "accepted

on Ohio law and the Defendant's actual as well as constructive ratification of the Third Deed, the court **FINDS** that on December 29, 2005 the Debtor conveyed her remaining one-half interest in the Property to the Defendant when she recorded the Third Deed with the Recorder's Office.

i. Direct Evidence of Fraudulent Intent: The Trustee established direct evidence of the Debtor's intent to defraud her creditors in effecting the December Transfer. The Debtor testified that she had contemplated filing bankruptcy long before she filed her petition and that her obtaining a fresh start was more or less a condition to marriage imposed by the Defendant. *See* Trial Tr., p. 88. The Debtor conceded that the December Transfer was made with the actual intent to keep the Property out of the reach of her creditors when she filed bankruptcy. *See* Trial Tr., pp. 103, 178, 181–83. She testified that she had discussed filing bankruptcy with the Defendant and that he had noted that the only way to keep the Property out of the hands of her creditors was to transfer it to a third party and that he "pressured" her to transfer the remaining one-half interest in the Property to him. Trial Tr., pp 88, 97–98, 103, 178. The Debtor's *Answer* in the Dischargeability Proceeding, Def. Exh. 19 in this proceeding, also confirmed this point:

As Debtor tried to further the goal of marriage, she expressed her desire to declare bankruptcy and have a fresh start going into the marriage. At that time, Plaintiff [Mr. Lassiter] pushed Debtor to quitclaim her interest in the

property from their names jointly as had been done for refinancing purposes to being in his sole name. Debtor did not want to do this and expressly stated so many times. Plaintiff [Mr. Lassiter] applied enormous pressure upon Debtor regarding her real property interest and told her that quitclaiming to him would be the only way that Debtor could keep her home if she filed for bankruptcy.

Def. Exh. 19, p. 2. The Defendant's own email message to attorney Charles Tate dated July 28, 2006,[16] seven months after the December Transfer, gives further credence to the Debtor's assertions:

Hi Charles:

Hope you are well. I presume to impose on you for legal advice, and if, I presume too much, please disregard. Here is the problem. My fiancee has $30,000 in credit card debts (I hope none are your clients), about $15,000 in principle [sic] and 415,000 [sic] in late fees and interests [sic]. She has no intention of paying off the credit cards as they [sic] balances are do [sic] to her former husband who is now discharged through bankruptcy. Obviously I don't want to marry her until this debt is cleared up. She says she has two options. Option A is to file for Chapter 7. . . . Option B is to hide out for X number of years until her creditors are time barred.

Pl. Exh. 21. While, this email does not refer to the December Transfer, it evidences the Debtor's intent to take measures to avoid paying her creditors, particularly the approximately $30,000 in credit

the quitclaim deed transferring interest in real property located at 5131 Carter Court to me (12–29–05). . . ." Pl. Exhs. 1–5; Def. Exh. 14. Thus, to the extent that the Defendant claimed a lack of knowledge or participation in the December Transfer, he ratified and accepted the transfer in accepting the Property as his own to the exclusion of the Debtor.

**16.** There was some debate at the trial whether this email occurred in July 2005 or July 2006, but the Defendant confirmed at the trial of this proceeding that this email was sent in July 2006. *See* Trial Tr., pp. 187–91.

card debt she owed and the Defendant's knowledge of all the Debtor's circumstances.

The court recognizes that the Debtor and the Defendant's acrimonious relationship contaminated their testimony in this proceeding. However based on the lack of a rational explanation for the December Transfer and the circumstances surrounding that transfer, including the Debtor's strong desire to retain the Property so that she could continue to raise her children in that Property (*See* Def. Exh. 16, 18, and 19 and Pl. Exhs. 1–3 and 22); the testimony and documentary evidence presented by the Trustee relating to the Debtor's deteriorating financial condition (*See* Trial Tr., pp. 75–76, 158–59 and Pl. Exhs. 16 and 21 and Def. Exhs. 14 and 19); the Defendant's substantial involvement in the Debtor's affairs (*See* Pl. Exhs. 17–19, 21, and 22); Plaintiff's Exhibit 21 affirming, in the Defendant's own words, the Debtor's testimony on these points; and the lack of credible rebuttal of that evidence by the Defendant; the court accords probative value to the Debtor's admission and **FINDS** that the December Transfer was made with the actual intent to hinder, delay or defraud the Debtor's creditors.

ii. "Badges of Fraud:" In addition to the direct evidence of the Debtor's fraudulent intent, the Trustee also established several badges of fraud to support her claim that the December Transfer was made by the Debtor with an actual intent to defraud her creditors. Some of the same badges of fraud that existed at the time of the April Transfer also existed on December 29, 2005, the date when the Third Deed was recorded.

 (a). Insider: Whereas this court concluded that the Defendant was not an insider for purposes of the Ohio UFTA in connection with the April Transfer, it reaches a different conclusion with

respect to whether the Defendant was an "insider" for purposes of § 548(a)(1). Under bankruptcy law, "insider" is a flexible term. The bankruptcy courts have noted that, rather than defining it, the Code gives non-exclusive examples. Thus, the Code provides that: a) "The term 'insider' includes . . ." [11 U.S.C. § 101(31)] and b) "'Includes' and 'including' are not limiting" [11 U.S.C. § 102(3)]. Further, the legislative history of the 1978 Code defines an insider as a person or entity with "a sufficiently close relationship with the Debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the Debtor." S.Rep. No. 95–989, 95th Cong., 2d Sess., *reprinted* in 1978 U.S.C.C.A.N., 5810; *Hunter v. Dupuis (In re Dupuis),* 265 B.R. 878, 885 (Bankr. N.D.Ohio 2001) and *In re Chira,* 353 B.R. 693, 724 (Bankr.S.D.Fla.2006). Such a relationship likely exists where the defendant is in a "position to exercise some degree of control or influence over the debtor." *Hunter,* 265 B.R. at 885 and *Chira,* 353 B.R. at 725. In *Slone v. Brennan (In re Fisher),* 2006 WL 1452498, at *7, n. 7 (Bankr.S.D.Ohio Jan.20, 2006), this court concluded that an unmarried cohabitating partner was an insider for purposes of fraudulent transfer law when the parties themselves freely admitted at trial that the defendant was an insider of the debtor. Thus, the crux of determining whether a person is an insider under the Code is ferreting out whether that person has "a sufficiently close relationship with the Debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor," including determining the extent to which the defendant was in a position to control or influence the debtor.

 The trial exhibits and testimony establish that Mr. Lassiter was, in December 2005, in a very strong position to influ-

ence the Debtor, and, in fact, did influence her. *See* Pl. Exhs. 12–15, 17, 19, and 22 and Def. Exh. 19. The Debtor explained that during her relationship with Mr. Lassiter, which lasted from approximately the fall of 2004 through at least May 2006 (*See* Trial Tr. pp. 48–49,186–87), she conducted herself as instructed by Mr. Lassiter. Trial Tr., pp. 57, 64, 73, 84, 143, 145, 169.[17] Perhaps it is for this reason that, at no time has the Defendant challenged the Trustee's assertion that he is an insider. While the Defendant disputed the Trustee's arguments as to the other badges of fraud in his *Post–Trial Brief* (Doc. 56, pp. 21–22), he seemed to acknowledge such status: "Thus, the plaintiff is left with at most one alleged badge of fraud, namely transfer to an insider." Def. Post Trial Brief, p. 22, ¶ 123. Accordingly, based on the facts that existed in December 2005 and the Defendant's acknowledgement of his insider status, the court **FINDS** that the Defendant was an insider of the Debtor with respect to the December Transfer.

(b). Retention of the Property: The Debtor still lived in and retained possession and control of the Property following the December Transfer. It was not until December 2006 that the Debtor vacated the Property. *See* Pl. Exh. 1–4 and Def. Exh. 10.

(c). Insolvency: Whether based on the Code definition or the Ohio UFTA definition, the Debtor remained insolvent on December 29, 2005. The Debtor's financial situation had not improved since the April Transfer. She only held a one-half interest in the Property, was still expected to reimburse the Defendant for the mortgage payments which she was still unable to do,

she was still paying utilities and maintenance costs for the Property and her credit card debt was accumulating. *See* Trial Tr., pp 75–76, 158–159, 224–227 and Pl. Exhs. 16 and 21 and Def. Exhs. 14 and 19.

In addition, the December Transfer negatively impacted the Debtor's financial situation. Using the value of the Property set forth in the Appraisal, she transferred an interest worth $79,000 in which she held equity in the amount of $11,070.09, an amount that, absent the December Transfer, would otherwise have been available for her creditors. From a balance sheet standpoint, the value of the Debtor's assets decreased by $11,070.09 (assuming the validity of the Bank's lien against the Property in the amount of $140,000, which the Trustee has conceded (*See* Trial Tr., p. 300)) with no corresponding decrease in liabilities. Under these circumstances, the court finds that the Debtor was insolvent at the time of the December Transfer. Further, even if she was not insolvent at the time of the December Transfer, the December Transfer rendered the Debtor insolvent.

(d). Transfer of Substantially All of the Debtor's Assets: An additional badge of fraud present on December 29, 2005 was that the Debtor transferred substantially all of her assets through the December Transfer. As stated, the Debtor's remaining one-half interest in the Property was the only significant asset that the Debtor possessed in December 2005. *See* Trial Tr., p. 75.

(e). Reasonably Equivalent Value: Finally, the value of the consideration the Debtor received was not reasonably equivalent to the value of the asset that she

---

**17.** *See* Pl. Exh. 19 for a stark example of the instructions that Defendant provided to Debtor: "1. Do not talk to Joe [Moser] unless he calls off the adultery attack. 2. Let's go to the Warren County Prosecutor to complain about the theft of e-mails as well a violation of either your CPO or [the Debtor's and Mr. Moser's daughter's CPO]. 3. Can we find the keys to go after Joe's diploma. 4. Is it possible to challenge Joe's VA benefits."

transferred. On the date of the December Transfer, the Debtor relinquished what was her principal asset, with a market value of $79,000 and in which the Debtor had $11,070.09 in equity. In contrast to the April Transfer, the Debtor received no consideration for the December Transfer—the refinancing of the loan had already occurred in June 2005 and the Defendant provided no additional value to the Debtor at the time of the December Transfer[18]. Conversely, the Defendant, for his part, received a benefit in the amount of $11,070.09. Obviously, the absence of value is not reasonably equivalent value and the court finds that the fifth badge of fraud has been established.

 The court therefore **FINDS** that the Trustee has established five of the eleven badges of fraud. Thus, the burden shifts to the Defendant to prove the absence of fraudulent intent and a legitimate purpose for the transfer of the Property. The Defendant failed to meet his burden.

As extensively discussed in the paragraph related to the validity of the Third Deed, the Defendant explained the December Transfer by asserting that the Bank demanded the transfer or would call the loan. However, the Defendant failed to produce a scintilla of evidence to support his allegation.

Trustee: So you can't produce a piece of paper from the bank saying we have found the problem and you need to correct this?

Defendant: No, nor was I asked to get a piece of paper on that.

Trustee: And you don't have one, that's why you can't produce it, right?

Defendant: Not to my knowledge. I wasn't asked to produce one.

Trustee: And your testimony was that that letter would have gone to Ms. Dullaghan, is that correct?

Defendant: That's not exactly the correct inference there. Ms. Dullaghan, it's her house and she's living in it, anything related to that would have gone to her. So even if that was addressed to me, she would have just come to my house and picked that letter up or if it was addressed to her then, obviously, she would have gotten it. But as I say here, I don't think there was a written correspondence to that effect but I don't know fir sure if there was one or not, I just don't think so.

Trustee: You were the lender's customer, correct?

Defendant: I was on the loan.

Trustee: The statement for mortgage payments due came to you, is that correct?

Defendant: That's correct.

\* \* \* \*

Trustee: But it is your testimony that if correspondence regarding this audit was sent, that Ms. Dullaghan received it ultimately, is that correct?

\* \* \* \*

Defendant: I think that's correct.

Trustee: And I believe that you testified that if a phone call came, it

---

18. The Defendant alleges that he provided value to the Debtor in the form of free housing. The court finds that this argument is to no avail to the Defendant as explained in the constructive fraudulent transfer section of this decision.

would have been a phone call directed to her, is that correct?

Defendant: There were different agents who picked up this file from time to time. Many of the agents who picked it up would have known to call her. Those that didn't would call me and I would listen for a couple minutes then pass it on to Ms. Dullaghan.

* * * *

Trustee: Okay, so various agents of the bank would know about her existence even though her name is not on the note and she does not—statements are not directed to her, somehow they would know of her existence?

Defendant: I think that's what the impart of my testimony is because I would give the phone to her.

Trustee: And they would also have her phone number so they could call her directly?

Defendant: She would say, "Call me back on this issue" Whatever the issue was she was discussing with them.

Trial Tr., pp. 235–37

It strains credibility that the Bank would send mortgage statements to its client, the Defendant, as a borrower, at his home address but would communicate orally to the Debtor its demand to transfer full ownership of the Property or it would accelerate the loan as the Defendant testified. It also proves difficult to understand how someone who can produce receipts from expenses incurred during a family weekend trip he took in December 2005, as the Defendant did to evidence his absence from Ohio on the date of the December Transfer and therefore his alleged inability to sign the Third Deed, would satisfy himself with an oral communication to a third party in connection with such an important matter.

Conversely, the "closing fax" produced by the Trustee directing the closing coordinator for the refinancing transaction to ensure that the mortgage was signed in the following manner: "Devon Loraine Moser, married Harvey Christophe Lassiter, single." (*sic*) evidences the Bank's knowledge that the Property was held jointly by the Debtor and the Defendant at the time of the closing and the Bank's acquiescence to such joint ownership.

Through the various badges of fraud that she raised, the Trustee has established that the Debtor transferred her remaining one-half interest in the Property with an actual intent to hinder, delay, and defraud creditors by clear and convincing evidence. The Defendant has failed to rebut the presumption created by the Trustee's evidence and to establish any clear evidence of a legitimate purpose for the December Transfer. *See Silagy v. Gagnon (In re Gabor)*, 280 B.R. 149, 157 (Bankr.N.D.Ohio 2002). Furthermore, even in the absence of the badges of fraud, the Debtor's intent appears obvious in light of her direct testimony and her mounting financial difficulties.[19]

---

**19.** The facts of this proceeding are noticeably different from those set forth in *Daneman v. Stanley (In re Stanley)*, 384 B.R. 788 (Bankr. S.D.Ohio 2008), a decision on which the Defendant "bases his defense on the merits." Def. Post Trial Brief, pg 20, ¶ 117. In *Stan-* ley, almost two years prior to filing her petition, the debtor, who was in poor health and then living with her aunt in her aunt's house, transferred her dilapidated residence to her son in exchange for his payment of $4,000 to $5,000 in back taxes and the promise to reha-

Based on the foregoing, the court **FINDS** that the Trustee has met her burden under both the Ohio UFTA and the Code of establishing that the December Transfer was fraudulent pursuant to § 548(a)(1)(A) and ORC § 1336.04(A)(1) and can therefore be avoided.

### F. The Constructive Fraudulent Transfer Claims: Whether the Debtor Received Reasonably Equivalent Value for the Transfers

The Trustee has also pursued fraudulent conveyance claims under the constructive fraudulent transfer provisions of § 548(a)(1)(B) [20] and ORC § 1336.04(A)(2) [21]. As noted, the relevant

---

bilitate the property to provide the debtor a place to live. *Stanley*, 384 B.R. at 793. The son purchased building materials but failed to complete the rehabilitation of the house. *Id.* Almost a year later, in exchange for the amount he had invested in it, the son transferred the house to his sister who in turn was to rehabilitate it with the same aim of providing housing for her mother. *Id.* at 793–94. Six months later, after the daughter failed to obtain financing for the project, she transferred the property to an unrelated third party for $40,500. *Id.* at 794. The trustee sought to avoid the transfer under both the actual and constructive fraud provisions of the Ohio UFTA. The court found that while the transfer was to an insider and the debtor received less than equivalent value, the defendants, the son and daughter of the debtor, satisfied their burden of showing an absence of fraudulent intent and a legitimate purpose for the transaction. *Id.* at 800–04. Critical to the court's decision were the facts that the trustee had failed to show that the debtor was insolvent at the time of the transfer or rendered insolvent as a result of the transfer, the lack of evidence that her creditors had commenced or threatened suit against her and that the property was transferred as a result of any actual or threatened lawsuit, the fact that the transfer was not substantially all of the debtor's assets, that ultimately, the daughter provided housing for the debtor who came to live with her, and, above all, the fact that the trustee did not discredit the witnesses' testimony whom the court found credible and sincere. *Id.*

There are few similarities between this proceeding and the *Stanley* proceeding aside from the fact that like the defendants in *Stanley*, the Defendant in this proceeding was able to identify a clear supervening purpose for the April Transfer-the Defendant's refinancing of the Property so that the Debtor could remain in the Property. While the court need not reiterate its rationale for finding the Decem-

ber Transfer actually fraudulent, suffice it to say that, in contrast to the facts in *Stanley*, the Debtor in this proceeding was unquestionably insolvent at the time of the Transfers, she conceded that the purpose of the December Transfer was to isolate the Property from the reach of her list of creditors, the December Transfer represented substantially all of her assets, and, most significantly, the Defendant failed to articulate any legitimate purpose for the December Transfer. In fact, the inconsistent explanations that the Defendant provided lend credence to the Debtor's own admission of fraudulent intent.

20. Section 548(a)(1)(B) provides in relevant part:

> The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor, that was made or incurred on or within two years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
> (III) intended to incur, or believe that the debtor would incur, debts that would be beyond the debtor's ability to pa as such debts matured[.]

21. ORC § 1336.04(A)(2) provides:

> (A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor

provisions of the Ohio UFTA are nearly identical to the Code provision except that the Ohio UFTA extends the reach-back period to four years.

To prevail on her constructive fraudulent transfer claims, the Trustee must establish by a preponderance of the evidence that that the Debtor received less than reasonably equivalent value in exchange for the challenged Transfers and at least one of the following: a) the Debtor was insolvent at the time of the relevant transfer or became insolvent as result of the transfer; b) the Debtor was engaged in a business or a transaction for which her property remained unreasonably small in relation to the business or transaction; c) or the Debtor intended to incur, or believed or reasonably should have believed that she would incur debts beyond her ability to pay. 11 U.S.C. § 548(a)(1)(B); ORC § 1336.04(A)(2); *Fordu*, 201 F.3d at 707; and *Canyon Sys. Corp.*, 343 B.R. at 639.

For purposes of the Code as well as the Ohio UFTA, "value" means "property or the satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor." 11 U.S.C. § 548(d)(2); ORC § 1336.03(A). In determining whether a transfer is supported by reasonably equivalent value, courts generally compare the value of property transferred with that which is received in exchange for the transfer. *Fordu*, 201 F.3d at 707; *Canyon Sys. Corp.*, 343 B.R. at

arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:
* * * *
(2) Without receiving a reasonable equivalent value in exchange for the transfer or obligation, and if either of the following applies:

639. The critical time to determine whether a debtor receives reasonably equivalent value is the time of the transfer. *In re Chomakos*, 69 F.3d 769, 771 (6th Cir.1995). Whether consideration supporting a challenged transfer is reasonable must be determined from the standpoint of the debtor. *See Aristocrat Lakewood Nursing Home*, 729 N.E.2d at 777–78 (citing *SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.)*, 193 B.R. 451, 456 (Bankr.S.D.Ohio 1995), *aff'd in part, rev'd in part*, 224 B.R. 27 (6th Cir. BAP 1998)).

1. *The April Transfer.*

As discussed above, the April Transfer does not fall within the statutory limitation period of the Code. However, it falls within that of the Ohio UFTA and will therefore be considered under this provision.

The April Transfer was supported by reasonably equivalent value. By undertaking the refinancing of the Property, the Defendant relieved the Debtor of a $135,859.81 obligation corresponding to the outstanding balance on the Wells Fargo Note for which the Debtor was responsible. In exchange the Debtor relinquished the $11,070.09 she had in the one-half interest she transferred. *See* Trial Tr., pp. 77, 92, 300–01. Thus, the court **FINDS** that the Trustee cannot avoid the April Transfer as constructively fraudulent.

2. *The December Transfer.*

The December Transfer raises different issues, including whether the De-

(a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonable small in relation to the business or transaction;
(b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they become due.

fendant transferred anything of value to the Debtor in exchange for that transfer and, if so, the value of what the Defendant transferred to the Debtor.

The court has already determined that the Debtor conveyed to the Defendant value in the amount of $11,070.09 at the time of the December Transfer. Viewing the transaction from the Debtor's standpoint, the Debtor transferred to the Defendant her remaining one-half interest in the Property worth $79,000, relinquishing in the process the $11,070.09 in equity that she held at the time of the December Transfer. However, the court **FINDS** that the Debtor's transfer of that equity to the Defendant was not supported by reasonably equivalent value provided by the Defendant.

Once it is established that the Debtor transferred value to a third party within the applicable limitations period, then an analysis must be made as to whether: (i) value was given by the transferee; (ii) it was given in exchange for the transfer; and (iii) what was transferred was reasonably equivalent to what was received. 11 U.S.C. § 548(a)(1)(B)(i); ORC § 1336.04(A)(2); *In re Wilkinson,* 196 Fed. Appx. 337, 341 (6th Cir.2006); *Fordu,* 201 F.3d at 707–08; *Kaler v. Red River Commodities (In re Sun Valley Prods., Inc.),* 328 B.R. 147, 156 (Bankr.D.N.D.2005) (internal citations omitted).

■ The Defendant has argued that he provided value to the Debtor in the form of free housing. Under the circumstances of this proceeding, this free housing does not constitute value which can be setoff against the Trustee's constructive fraud claim. Any value provided by the Defendant is to have been provided in exchange for or contemporaneously with the transfer made by the Debtor. Thus, "attention is paid to the value received by the debtor on the date of the transfer, not on the value

given by the transferee." *Slone v. Dirks,* 2009 WL 103606, at *7 (6th Cir. BAP 2009), *citing In re Wilkinson,* 196 Fed. Appx. at 341–42. *See also In re Chomakos,* 69 F.3d 769, 771 (6th Cir.1995). Cases interpreting the "in exchange for" language of the statute generally hold that a transferee's conferring of a benefit to a debtor alone does not show that the benefit was given as a *quid pro* quo for the property transferred. *See Congrove v. McDonald's Corp. (In re Congrove),* 330 B.R. 880, 2005 WL 2089856, at *13 (6th Cir. BAP 2005) (table decision); *see also Meeks v. Don Howard Charitable Remainder Trust (In re Southern Health Care of Arkansas, Inc.),* 309 B.R. 314, 319 (8th Cir. BAP 2004); *Wessinger v. Spivey (In re Galbreath),* 286 B.R. 185, 210 (Bankr.S.D.Ga.2002), *Frank v. Kiesel (In re Denison),* 292 B.R. 150, 156 (E.D.Mich. 2003) (enforceable contract rights to future consideration can provide reasonably equivalent value in exchange for a challenged transfer); *Fisher v. Slone (In re Fisher),* 296 Fed.Appx. 494, 502 (6th Cir. 2008) (citing *Simione v. Nationsbank of Del., N.A. (In re Simione),* 229 B.R. 329, 335 (Bankr.W.D.Pa.1999) (where a conveyance of property is made in consideration of an agreement to support the grantor in the future, it is invalid as to creditors)).

The evidence does not reflect that the free housing was provided by the Defendant in exchange for or as a *quid pro quo* for the December Transfer. The Debtor and the Defendant never entered into any form of agreement, oral, written, formal, or informal, as to the terms of the Debtor's occupancy of the Property after the Defendant acquired his interests in the Property. The only evidence as to any understanding between the Debtor and the Defendant reflects that the Debtor would repay the Defendant for the mortgage payments made by the Defendant to the

extent she was able. *See* Trial Tr., pp. 100, 226–27 and Def. Exh. 19 and Pl. Exh. 2.[22] Contrary to this later position taken by the Defendant, he earlier asserted a right of setoff and a counterclaim in the amount of $14,000 corresponding to seventeen months of mortgage payments unpaid by the Debtor, as well as a claim for $15,426.16 for monies he expended to make the Property marketable after the Debtor moved out of the Property. *See* Doc. 7. *See also* Pl. Exh. 2. Thus, while the Defendant relieved the Debtor of her payments to Wells Fargo, he replaced them with a new obligation owed to him.[23] It was only "free housing" because of the Debtor's inability to pay him. Trial Tr. pp., 100, 226–27; Pl. Exh. 2; *Defendant's Answer and Counterclaim* (Doc. 7). This obligation on the part of the Debtor to reimburse the Defendant for the mortgage payments simply created an independent debt owed by the Debtor to the Defendant and rendered the Defendant an unsecured creditor for the amount of the mortgage payments unpaid by the Debtor.[24]

Ohio law is consistent with the court's conclusion that the asserted free housing does not constitute value provided by the Defendant in exchange for the December Transfer. In order for the satisfaction of

a pre-existing debt to constitute sufficient consideration, there must be an agreement that the debt is extinguished. No consideration exists if, after the transfer, the parties treat the debt between them as still subsiding. *Id.* (citing *Cellar Lumber Co. v. Holley*, 9 Ohio App.2d 288, 224 N.E.2d 360, 364 (1967) (citation omitted); *accord Abood v. Nemer*, 128 Ohio App.3d 151, 713 N.E.2d 1151, 1155 n. 4 (1998) (noting that plaintiff has burden of proving lack of agreement)) [25].

Accordingly, the court **FINDS** that the Defendant's providing of housing to the Debtor did not constitute reasonably equivalent value provided "in exchange" for the December Transfer and that the Trustee has met her burden of proving that the Debtor did not receive reasonably equivalent value for the December Transfer. The court **FINDS** that the Defendant provided no value for the transfer of the $11,070.09 in equity to the Defendant in December 2005.

 However, in order to succeed on her constructive fraud claim, the Trustee also needed to establish the Debtor's impaired financial condition. The Trustee satisfied her burden. Under ORC § 1336.04(A)(2), she had to show that either (i) the Debtor was engaged or about

**22.** In addition, evidence was introduced which indicated that the Defendant was permitting the Debtor to reside in the Property following the Transfers "in lieu of child support." *See* Def. Exh. 18.

**23.** Near the end of the trial, the Defendant declared that any understanding that he may have had as to the Debtor's obligation to reimburse him for the mortgage payments had all but disappeared by the time of the December Transfer because the Debtor had ceased making those payments after the first one. Trial Tr., pp. 274–75. The Defendant's change in his position at the trial was inconsistent with other evidence introduced at the trial, including Defendant's admissions contained in Pl. Exh. 2.

**24.** As noted above, on January 6, 2009, the court issued an oral decision finding that the Defendant could not setoff this claim or any other such prepetition claims against the Trustee's fraudulent conveyance claims being pursued through this proceeding. *See* Doc. 41, n.5.

**25.** These cases were decided under a prior version of the Ohio UFTA. The prior statute also required that consideration be given "in exchange for" the conveyance at issue. There is no reason to think that Ohio courts would apply a different analysis under the current version of the Ohio UFTA.

to engage in a business or a transaction for which her remaining assets were unreasonably small in relation to the business or transaction or (ii) she intended to incur or believed or reasonably should have believed that she would have incurred debts beyond her ability to pay as they became due. ORC § 1336.04(A)(2)(a) and (b). The language of § 548(a)(1)(B) substantially follows that of the state statute but provides the additional alternative of showing that the Debtor was insolvent at the time of the transfer or was rendered insolvent as a result of the transfer.

The evaluation of the Debtor's financial condition at the time of the December Transfer, in connection with the Trustee's actual fraud claim, revealed that the Debtor was insolvent at the time of the December Transfer or rendered insolvent as a result of that transfer. Accordingly, the Trustee has met her burden of showing that the December Transfer was constructively fraudulent under § 548(a)(1)(B) and ORC § 1336.04(A)(2)(a).

The Trustee also established that the December Transfer left the Debtor with an unreasonably small amount of capital in relation to the challenged transfer under § 548(a)(i)(B)(ii)(II) and ORC § 1336.04(A)(2). As of the time of the December Transfer, the Debtor's only significant asset was her remaining half interest in the Property. She testified and the court found that, the Debtor was insolvent as early as April 2005 and remained insolvent as of December 2005. At the time of the December Transfer, the Debtor's remaining equity in the Property amounted to $11,070.09. Therefore, by conveying her remaining one half interest in the Property, she relinquished such equity, her only asset which otherwise would have been available to her creditors, and was left with nothing. In other words, the Debtor's net worth decreased by $11,070.09 while her debts, all incurred prior to November 2005, remained unpaid. Therefore, the fact that the Debtor was already insolvent as of the April Transfer and that her situation did not improve after that compels the conclusion that the December Transfer left the Debtor with assets that were unreasonably small in relation to the challenged transfer.

Accordingly, the court **FINDS** that the Trustee has established that the December Transfer was constructively fraudulent under ORC § 1336.04(A)(2)(a) and (b) and § 548(a)(1)(B).

### G. The Defendant Has Failed to Establish Affirmative Defenses Under § 548(c), ORC § 1336.08, and § 550(e)

 While the Defendant has argued that he is entitled to the protection of the affirmative defenses of having provided value to the Debtor in exchange for or subsequent to the Transfers, he has failed to establish that any value was provided in good faith as required by §§ 548(c) and 550(e)(1) and ORC § 1336.08(A). Accordingly, the Defendant has failed to establish the availability of these defenses.

Section 548(c) and ORC § 1336.08(A) allow a recipient of a fraudulent transfer to still avoid liability to the extent that the recipient proves that value was given in good faith.[26] Further, § 550(e)(1) protects

---

**26.** Section 548(c) provides:

Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of the title, the transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such a transfer or obligation.

a good faith transferee to the extent of the lesser of the cost of any improvement the transferee makes to the transferred property and the increase in value of the property as a result of the improvement. Paragraph 2 of subsection (e) defines improvement to include physical additions or changes to the property transferred, repairs, payment of taxes on the property, payment of a debt secured by a lien on the property that is superior or equal to the trustee's rights, discharge of a lien on the property and preservation of the property. 11 U.S.C. § 550(e)(2).

In his Motion to Dismiss, the Defendant raised facts and issues related to money he put into to the Property to render it marketable after the Debtor vacated the Property. *See also Defendant's Answer and Counterclaim* (Doc. 7) and Pl. Exh. 2. The court stated in its oral decision on the Defendant's Motion To Dismiss and the Trustee's Motion for Partial Summary Judgment that it would consider such evidence in relation to the above referenced affirmative defenses, but not in relation to

the Defendant's setoff claim nor to establish the defense of *in pari delicto* (*See* Doc. 41). At the trial, the Defendant introduced evidence of the money he put into the Property for repairs and of the amount of rent he considered the Debtor owed him to establish value received by the Debtor for the Transfers or his entitlement to a lien under ORC § 1336.08(A) and §§ 548(c) and 550(e). The Trustee argues that the Defendant cannot avail himself of those defenses because the Defendant neither provided value nor did he do so in good faith.

Based on this court's conclusion that only the December Transfer is avoidable under both the actual and constructive fraudulent transfer prongs of the Code and the Ohio UFTA, the court will review the availability of these defenses only with respect to the December Transfer.

In order to establish a defense to avoidability under § 548(c), a transferee must show both that the value provided to the Debtor was reasonably equivalent to the value transferred by the Debtor and that

11 U.S.C. § 548(c). Closely paralleling the Code language, ORC § 1336.08 provides in relevant part:

(A) A transfer or an obligation is not fraudulent under division (A)(1) of section 1336.04 of the Revised Code against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee.

(B)(1) Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor or a child support enforcement agency under division (A)(1) of section 1336.07 of the Revised Code, the creditor or agency may recover a judgment for the value of the asset transferred, as adjusted under division (B)(2) of this section, or the amount necessary to satisfy the claim of the creditor or agency, whichever is less. The judgment may be entered against either of the following:

(a) The first transferee of the asset or the person for whose benefit the transfer was made;

(b) Any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee.

(2) If the judgment under division (B)(1) of this section is based upon the value of the asset transferred, the judgment shall be in an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require.

(C) Notwithstanding the voidability of a transfer or an obligation under division (A)(1) of section 1336.07 of the Revised Code, a good faith transferee or obligee is entitled, to the extent of the value given to the debtor for the transfer or obligation, to any of the following:

(1) A lien on or a right to retain any interest in the asset transferred;

(2) Enforcement of any obligation incurred;

(3) A reduction in the amount of the liability on the judgment. ORC § 1336.08.

the transfer received from the debtor was received in good faith. *See* 11 U.S.C. § 548(c); *Durkin v. Shields (In re Imperial Corp. of America )*, 1997 WL 808636, at *4 (S.D.Cal. Aug.14, 1997); *Noland v. Hunter (In re Nat'l Liquidators, Inc.)*, 232 B.R. at 99, 102 (Bankr.S.D.Ohio 1999). The Ohio UFTA offers a substantially similar good faith defense to the recipient of an actual or constructive fraudulent transfer. *See* ORC § 1336.08. The Court's good faith analysis under § 548(c) is identical to that undertaken under ORC § 1336.08. *Compare Hunter*, 232 B.R. at 102 (construing § 548(c)) *with Aristocrat Lakewood Nursing Home v. Dryja (In re Dryja )*, 259 B.R. 629, 634 (Bankr.N.D.Ohio 2001) (construing ORC § 1336.08). Finally, § 550(e) only insulates a good faith transferee from a trustee's recovery.

Because the Debtor did not receive value from the Defendant in exchange for the December Transfer, the Defendant may not avail himself of the good faith defense afforded by § 548(c) and ORC § 1336.08. Good faith giving of value to a debtor in exchange for a transfer is in the nature of an affirmative defense to a fraudulent transfer claim, as to which the transferee bears the burden of proof. 11 U.S.C.A. § 548(c). *Wilson v. Carman (In re Blazo Corp.)*, 73 F.3d 361, 1995 WL 764130, at *3 (6th Cir.1995) (table decision). The extent to which a defendant "gives value" for a particular transfer is essentially the flip side of the question of whether the debtor received "reasonably equivalent value" in exchange for the transfer. *In re Taubman*, 160 B.R. 964; 987 (Bankr.S.D.Ohio 1993). Further, "The [two] terms—'reasonably equivalent value' in § 548(a)(1)(B) and ORC § 1336.04(A)(2) and 'value' in § 548(c)— have the same fundamental meaning." *Canyon Systems Corp.*, 343 B.R. at 650–51 (citing *Balaber–Strauss v. Sixty–Five Bro-*

*kers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664, 677 (Bankr.S.D.N.Y.2000)). Having previously determined that the Defendant failed to provide the Debtor with reasonably equivalent value in exchange for the December Transfer, the court need not undertake a good faith analysis with respect to the § 548(c) and ORC § 1336.08 defenses.

Still, even if the Defendant had provided value to the Debtor, he would not qualify as a good faith transferee. "Good faith" is not defined by the Code and is a determination made on a case-by-case basis. *Brown v. Third Nat'l Bank (In re Sherman )*, 67 F.3d 1348 (8th Cir.1995) (citing *In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir.1983)). In determining whether a transferee acted in good faith,

> [T]he courts look to whether the transferee objectively 'knew or should have known' instead of examining the transferee's actual knowledge from a subjective standpoint. In other words, a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency.

*Id.* (internal citations omitted).

The Defendant was aware of sufficient facts concerning the Debtor's precarious financial situation to place him on inquiry notice. Based on his in-depth involvement in all aspects of the Debtor's life during the course of their relationship, the Defendant had long known of the Debtor's financial problems. *See* Trial Tr., pp. 87–90, 97–98 and Pl. Exhs. 13, 21, and 22 and Def. Exh. 14. In fact, the "raison d'être" of the refinancing transaction, and the Transfers, was to permit the Debtor to avoid the very consequences of her precarious financial situation and enable her to keep the Property. The Defendant's claimed ignorance of the Debtor's financial situation lacks credibility (*See* Trial Tr., pp. 224–26), par-

ticularly when it was that very situation that led to the Transfers and ultimately the Debtor's bankruptcy.

Therefore, the court **FINDS** that the Defendant is not a "good faith" transferee and cannot avail himself of the defenses set forth in §§ 548(c) and 550(e)[27] and ORC § 1336.08(A).

### H. The Trustee is Entitled to Recover from the Defendant the Value of the Debtor's Equity in the Property at the Time of the December Transfer

The Trustee seeks a judgment entitling her to recover from the Defendant the value of the Debtor's equity in the Property, as opposed to the court's avoidance of the transfer as provided in § 550(a). Based on this court's decision that the December Transfer is avoidable, the Trustee may recover the value of the Debtor's equity at the time of the December Transfer.

Under § 550(a),[28] to the extent that a transfer is avoided under § 548, the trustee can recover the property or the value of the transferred property. The purpose of this section is "to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred." *Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165, 176 (Bankr.S.D.N.Y.1998) (citations omitted); *see also Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd.*, 229 F.3d 245, 250 (3d Cir.2000); *Kuhn v. Nance (In re Nance)*, 26 B.R. 105, 107 (Bankr.S.D.Ohio 1982). The entire transfer need not be undone. *In re Murphy*, 331 B.R. 107, 122 (Bankr.S.D.N.Y.2005). A fraudulent transfer should be avoided only to the extent creditors were harmed. *Murphy*, 331 B.R. at 122 (protecting creditors from the effects of fraudulent transfers can be accomplished by "limiting the measure of avoidance damages under Sections 548 and 550 to the amount necessary to make creditors of the debtor's estate whole").

The court has discretion under § 550(a) to order a reconveyance of the transferred property or the value of the property. *Andrew Velez Constr., Inc. v. Consolidated Edison Company of New York, Inc. (In re Andrew Velez Constr., Inc.)*, 373 B.R. 262, 274 (Bankr.S.D.N.Y. 2007); *Morris v. Kansas Drywall Supply Co. (In re Classic Drywall, Inc.)*, 127 B.R. 874 (D.Kan.1991). Case law has developed a number of factors to consider in determining whether to order a recovery of the property or its value. *Andrew Velez Const.*, 373 B.R. at 274. They include whether the

---

27. Had the Defendant been able to avail himself of the defense provided by § 550(e), the court finds that the Defendant has not introduced any evidence as to the increase in value of the Property as a result of the improvement he claims. *See* 11 U.S.C. § 550(e)(1). While the Defendant introduced an exhibit which he used in the Dischargeability Proceeding concerning amounts that he paid to Ella Walters' property management company, to render the Property marketable for sale or rental after the Debtor moved out of the Property (*See* Def. Exhs. 11 and 13), he did not provide any testimony or other evidence in this adversary proceeding as to the specifics of any of those expenditures, including whether they improved the Property and, if so, to what extent. Without that evidence, this court cannot make any finding as to the lesser of the cost or any increase in value of such improvement as required by § 550(e)(1).

28. In pertinent part, this section provides:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided ... the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
(1) the initial transferee of such transfer ... [.]

value of the property is contested, is not readily determinable or is not diminished by conversion or depreciation. *Id.* Courts generally permit the recovery of the value of the property if such value is readily determinable and a monetary award would provide savings to the estate. *Id.* (citing *Aero–Fastener, Inc. v. Sierracin Corporation (In re Aero–Fastener, Inc.)*, 177 B.R. 120, 139–40 (Bankr.D.Mass.1994)).

The Transfers took place in 2005. At the time of the April Transfer, the value of the Property based on the Appraisal was $158,000. The Debtor's equity in the Property amounted to $22,140.18. Pursuant to the April Transfer, the Debtor transferred her first one-half interest to the Defendant and relinquished half of that equity—$11,070.09. She however retained one-half interest in the Property as well as the remaining equity associated with that interest. This court has already determined that the value assigned to the Property in the Appraisal was an appropriate reference to determine the value of the Debtor's interest transferred to the Defendant pursuant to the December Transfer. Therefore, the value of the Debtor's equity in the Property at the time of the December Transfer was $11,070.09.

Merely setting aside the December Transfer, more than three years after the date it occurred and placing the burden on the Trustee to sell the Property in the midst of a downturn in the real estate market that occurred after the December Transfer would not restore the bankruptcy estate to where it would have been had the December Transfer not taken place. The Trustee would have to sell the recovered Property pursuant to § 363(b) and incur further expenses.

Conversely, awarding a money judgment to the Trustee would place the estate in the same position it would have been had the December Transfer not taken place.

The value of the Property and, therefore, the Debtor's equity in the Property at the time of the December Transfer is easy to calculate and awarding the amount of the equity to the Trustee would save the estate money and provide concrete relief to the estate for the benefit of the Debtor's creditors. Therefore, pursuant to § 550(a) and ORC § 1336.07, the Trustee is entitled to recover from the Defendant the amount of $11,070.09 corresponding to the amount of the equity that the Debtor relinquished when she transferred her remaining one-half interest in the Property to the Defendant for no consideration in December 2005.

## IV. Conclusion

For the foregoing reasons, the court **FINDS** that the Trustee is not entitled to avoid the April Transfer but is entitled to avoid the December Transfer and to recover $11,070.09, the amount of the Debtor's equity at the time of that Transfer.

The court will enter a separate order in accordance with this decision.

**IT IS SO ORDERED.**